UNITED STATES, Appellant

v

JOHN H. DAVENPORT, Airman Third Class,
U. S. Air Force, Appellee

14 USCMA 152, 33 CMR 364

*Captain Donald W. Brewer* argued the cause for Appellant, United States. With him on the brief was *Lieutenant Colonel Emanuel Lewis.*

*Major William A. Crawford, Jr.,* argued the cause for Appellee, Accused. With him on the brief was *Colonel Daniel E. Henderson, Jr.*

## Opinion of the Court

KILDAY, Judge:

The accused was convicted by special court-martial at Ankara, Turkey, for unlawful entry and larceny of twelve hunting knives, in violation of Articles 134 and 121, Uniform Code of Military Justice, 10 USC §§ 934 and 921, respectively. He was sentenced to a bad-conduct discharge, confinement at hard labor for two months and reduction to airman basic. Intermediate authorities approved the findings and sentence. However, an Air Force board of review found that trial counsel had "failed to place upon the record a sufficient showing that Major Henderson [accused's commanding officer] acted on probable cause in authorizing the search" of accused's automobile and quarters. It ordered a rehearing where "the question of the lawfulness of the search may be further developed."

The Judge Advocate General of the Air Force certified the case to this Court, pursuant to Article 67(b)(2), Uniform Code of Military Justice, 10 USC § 867, on the following issues:

(1) Was the board of review correct in its determination that the prosecution failed to establish that probable cause existed for the search?

(2) If the first question is answered in the affirmative was the board of review correct in its determination that a rehearing could be ordered?

On or about July 4, 1962, the Rod and Gun Club, Ankara, Turkey, an Air Force nonappropriated fund activity located in the same building as accused's detachment, was unlawfully broken into. An inventory conducted by the club custodian shortly after the discovery of the breaking (July 5) disclosed that twelve hunting knives were missing. On July 10, Airman Raymond, an air police investigator, had occasion to visit the local Office of Special Investigations detachment on routine business unrelated to the above-noted offense. While there he was asked whether he had knowledge of this case and when he replied in the affirmative he was told that before he left the OSI office he would be furnished with the identity of the person who had committed the offense. Shortly thereafter, Raymond was presented with a 3 x 5 card bearing the name of the accused. He was told that the informer was a person, known to the OSI, who had seen the knives; however "they would not tell me who the person was." Raymond returned to his office and gave this information to his noncommissioned officer in charge, Sergeant Strodomski.

Strodomski and Raymond thereupon proceeded to Davenport's detachment, contacted the commanding officer, Major Henderson, and requested and received permission to search the quarters and privately owned vehicle of the accused.

Armed with this authority, Strodomski and Raymond searched for the accused and about 8:00 p.m. of the same day found him in a hotel in Ankara where he was visiting his girl friend and her parents. He was "apprehended" at that place and returned to the Base

Motor Pool area. Raymond rode with the accused in the latter's car and Strodomski drove a motor pool car. Upon arrival at the "carbarn" of the motor pool, Strodomski read Article 31 to the accused, told him he had authority to search his car, and asked him to open the trunk and remove all articles therefrom. Three knives were found in a fishing kit, two of which were similar in design to the stolen articles. Accused claimed all three knives were his. Thereafter, using the same modes of transportation, all three went to accused's billet where a search for additional knives was negative.

Accused was then taken to the Air Police office in the same billets and questioned for forty-five minutes to one hour, at the end of which time accused orally admitted the burglary and the larceny and took Strodomski to the hiding place of the other ten knives (being in a bag in a shaft in the latrine). Thereafter, he executed a written statement (prosecution exhibit 18), which was admitted into evidence over objection of defense counsel, who claimed it was involuntary, primarily as having been based on an illegal search and seizure. In this connection, it should be noted that the board of review found that a substantial relationship existed between the search and the confession and that the accused was prejudiced by the receipt of his confession without a showing by the prosecution of the lawfulness of the search.

### I

In view of the nature of the first certified question, it is imperative that we determine the basis for Major Henderson's grant of authority to search.

Since Airman Raymond admittedly told the commander nothing, we must look to the testimony of Sergeant Strodomski for the answer. After testifying as to his conversation with Raymond, Strodomski was questioned as follows:

"Q. (TC) Alright, after this did you go to see Major Henderson?

"A. Yes, Sir.

"Q. What did you tell Major Henderson?

"A. We told Major Henderson practically the same thing that Airman Raymond told me. I told the Major that I had received information that Airman Davenport was the man involved in the breaking in of the Rod & Gun Club and he did have in his possession the knives, either in his car or his quarters and requested his permission to conduct the search. I told him the commander could be present and specified the date of the search.

"Q. You are sure you told him knives of a similar description had been seen in the possession of Airman Davenport. Did you tell him that?

"A. I don't believe I told him the knives were seen.

"Q. Did you tell him you had information the knives were in the possession of Airman Davenport?

"A. Yes, I did."

At this point prosecution exhibit 4 (written request to search, approved by the commanding officer)[1] was introduced into evidence without objection by defense counsel.

### "CROSS EXAMINATION

. . . . .

"Q. [DC] So you went to Major Henderson with this information.

"A. Yes, Sir, I did.

"Q. Did you tell him that the knives had been seen in the possession of Airman Davenport?

"A. I don't think I told him that;

---

[1] "TO: COMMANDER TUSLOG DETACHMENT 6
APO 254, U. S. Forces
10 Jul 1962

"1. Requested permission to search the quarters and the privately owned vehicle of A3C Davenport John H. AF 19693961 for Hunting Knives.

"2. The search is to be conducted on 10 Jul 62, due to an official investigation.

/s/ JOSEPH STRODOMSKI
JOSEPH STRODOMSKI
SSGT USAF
Air Police Inv."

I simply told him I had information that Airman Davenport was the man involved in the breaking in of the Club and that he had the knives—they were supposed to be in his possession. I requested his permission to search. I wanted to get it orally but he preferred to have it in writing.

"Q. Did you tell him where you got your information from?

"A. I did not.

"Q. You did not tell him?

"A. To the best of my knowledge I did not tell him."

This is the totality of the testimony relative to the issue of probable cause. Major Henderson did not testify.

In United States v Ness, 13 USCMA 18, 32 CMR 18, we stated that:

". . . a search based on a warrant is invalid if probable cause does not appear in the facts presented to the officer issuing the warrant. See Jones v United States, 362 US 257, 4 L ed 2d 697, 80 S Ct 725 (1960); Johnson v United States, 333 US 10, 92 L ed 436, 68 S Ct 367 (1948); United States v Brown, 10 USCMA 482, 24 CMR 48.

"Probable cause to search exists if the facts and circumstances justify a prudent man in concluding that an offense has been or is being committed. Henry v United States, 361 US 98, 4 L ed 2d 134, 80 S Ct 168 (1959)." [See also Brinegar v United States, 338 US 160, 93 L ed 1879, 69 S Ct 1302; Carroll v United States, 267 US 132, 69 L ed 543, 45 S Ct 280, 39 ALR 790.]

In Jones v United States, 362 US 257, 4 L ed 2d 697, 80 S Ct 725 (1960), the Supreme Court stated that:

". . . We held in Nathanson v United States, 290 US 41, 78 L ed 159, 54 S Ct 11, that an affidavit does not establish probable cause which merely states the affiant's belief that there is cause to search, without stating facts upon which that belief is based. A fortiori this is true of an affidavit which states only the belief of one not the affiant. . . .

"In testing the sufficiency of probable cause for an officer's action even without a warrant, we have held that he may rely upon information received through an informant, rather than upon his direct observations, so long as the informant's statement is *reasonably corroborated by other matters within the officer's knowledge*. Draper v United States, 358 US 307, 3 L ed 2d 340, 79 S Ct 340." [Emphasis supplied.] [See also United States v Ness, supra.]

Turning to the "warrant" to search, secured by Sergeant Strodomski from Major Henderson, we find nothing therein to substantiate the existence of probable cause as defined in the above-cited cases. The "warrant" merely contains (1) a request for permission to search the quarters and privately owned vehicle of the accused for hunting knives and (2) a statement that the search is to be conducted on July 10, 1962, "due to an official investigation." It reflects no information indicating that Sergeant Strodomski had reason to believe that there was cause to search except, perhaps, the last-quoted phrase, anent an official investigation, and that is insufficient. Nathanson v United States, supra.

Since we are not restricted to a consideration of the written permission to search but may consider the record as a whole to establish the state of Major Henderson's knowledge in this connection, we next look to the testimony of Sergeant Strodomski. Therein we find he told the commanding officer he had received information that Davenport was the man involved in this affair and that he had information the knives were supposed to be in the possession of the accused. However, he did not tell him the source of his information or furnish any corroboration for his belief that this information might be accurate. Standing alone, the "warrant" and the testimony of the Sergeant are an insufficient basis for a finding by Major Henderson of the existence of probable cause. United States v Jones, supra; United States v Ness, supra.

**155**

The Government, in its brief, concedes this to be true for it states:

". . . Nor do we contend in this case that the informer's report as related to Major Henderson was sufficient, standing alone, to constitute probable cause for authorizing the search.

. . . . .

". . . It is, of course, true that Strodomski's report, standing alone, contained nothing indicative of its reliability."

It argues, nevertheless, that we should consider the whole of the record which "clearly reveals several independently significant facts otherwise known to Major Henderson which *in themselves* amounted to strong ingredients of probable cause"; that because of the location and duty hours of his detachment, Major Henderson was certainly not only aware of the offenses but had reasonable grounds to believe that someone in his detachment committed the crime; and, in view thereof, "would have been clearly justified in authorizing a 'shakedown' search of the property and belongings of all members of his detachment." Further, "it follows, *a fortiori*, that he likewise had probable cause to authorize a search involving any single member." Such being the case "Major Henderson's reasons for choosing to single out the accused are simply of no consequence."

With this contention we do not agree. This Court has long recognized the right of a commander to conduct or authorize a "shakedown" type search (United States v Harman, 12 USCMA 180, 30 CMR 180; United States v Gebhart, 10 USCMA 606, 28 CMR 172) under appropriate circumstances.

However, as we stated in Gebhart, supra:

". . . the exercise of the power to order searches is not unlimited.

. . .

". . . the exercise of the authority to search must be founded upon *probable cause*, whether the search be general in that it includes all personnel of the command or subdivision, or limited only to persons specifically suspected of an offense. United States v Doyle, supra; United States v Brown, 10 USCMA 482, 28 CMR 48.[2] A search founded upon mere suspicion is illegal and the fruits thereof inadmissible. United States v Brown, supra. To hold otherwise would require us to deny to military personnel the full protection of the United States Constitution itself. This, neither we, nor the Congress, nor the Executive, nor any individual can do." [Emphasis supplied.] [United States v Doyle, 1 USCMA 545, 4 CMR 137.]

In the case at bar, there is little reason to believe that Major Henderson could have justified a ■■■■■■■ ■ "shakedown" type search of all of the members of his detachment or of the accused alone. There is no showing that access to the building, in which the Rod and Gun Club was located, was limited to any degree. In point of fact, Lieutenant Commander Dussel, custodian of the club, who testified to finding the broken door latch and the subsequent inventory, was a member of the United States Navy, attached to the JUSMMAT Navy group. Yeoman Schwarzenbach assisted him. How many other military groups or individuals are represented in the club and have access to the building is unknown. In addition, the record reflects that there are "at least two detachments," #6 (Major Henderson's) and #55, occupying the same building on a twenty-four-hour basis. And, that while there are other offices on the same floor as the club, it appears these are not occupied on a "24 hour a day" basis, giving rise to the possibility that these are assigned to personnel of detachments other than numbers 6 and 55. For aught the record shows, inasmuch as the building was located within the city limits of Ankara, these and other offices may well have been occupied by other than military personnel—perhaps even by citizens of Turkey.

---

[2] With reference to searches within the inherent powers of the commander, see footnote to United States v Gebhart, 10 USCMA 606, at page 610, 28 CMR 172.

Going beyond the apparent knowledge furnished to or in the possession of the authorizing officer, Major Henderson, we look to the original source of the information that the knives in question were allegedly seen in the possession of the accused. As noted above, this information was obtained by the OSI from an unnamed informant.

The alleged "tip" upon which sole reliance is here placed, could, if reliable, have warranted a man of ■ prudence and caution in believing that the accused had possession of the fruits of this crime. The reliability of the informant is the controlling factor. Costello v United States, 298 F2d 99 (CA 9th Cir) (1962).

As stated in *Costello,* supra:

"All the cases in which a 'tip' has been heavily relied upon to establish probable cause have stressed the need for 'a substantial basis for crediting the hearsay,' Jones v United States, 362 US 257, 269, 80 S Ct 725, 735, 4 L ed 2d 697 (1960), or a record of 'accurate and reliable information,' Draper v United States, 358 US 307, 313, 79 S Ct 329 (1958); in short, 'a previously reliable informant,' Espinoza v United States, 278 F2d 802 (5th Cir 1960). Prudent and cautious men would not act in so decisive a fashion in reliance on an uncorroborated anonymous caller, *and there is nothing in this record to show that the present informant was anything more than that."* [Emphasis supplied.]

As in *Costello,* there is nothing in this record to reflect that the OSI's informant was any more reliable than an anonymous caller. And, it is well settled that a search cannot be justified or a "tip" corroborated by what is found. Johnson v United States, 333 US 10, 92 L ed 436, 68 S Ct 367 (1948).

In the posture of this record we must agree with the board of review that the prosecution failed to make a sufficient showing that Major Henderson acted on probable cause in authorizing the search. Accordingly, the first certified question is answered in the affirmative.

II

The second certified question depends for its resolution on whether the Government's failure to show probable cause results in there being insufficient evidence in the record to convict, in which case we should order the charges dismissed, or whether the conviction rested on evidence improperly admitted at trial for which there may have been an admissible substitute. Article 67 (e), Uniform Code of Military Justice, 10 USC § 867; paragraph 92, Manual for Courts-Martial, United States, 1951; Hearings before House Armed Services Committee, 81st Congress, 1st Session, on H. R. 2498, page 1271, and House Report 491, 81st Congress, 1st Session, page 30; United States v Porter, 9 USCMA 656, 26 CMR 436.

After finding that the prosecution's case for the existence of probable cause to search was "underdeveloped," the board of review held that "the search of the accused's automobile, which preceded the statement to his interrogators, may not be sustained as an incident of the accused's apprehension for the reason that the automobile was not within his 'immediate' possession at the place of his apprehension [United States v Ross, 13 USCMA 432, 32 CMR 432]." It also found that "a substantial relationship existed between the finding of the hunting knives in the accused's automobile and his decision to confess." Whether this latter statement was intended to be a finding of fact by the board, ■ ing which would invalidate the confession as having been based on an illegal search, is not clear.[3] If it was such a finding, we may not disturb it (United States v Alaniz, 9 USCMA 533, 26 CMR 313, and cases cited therein) absent a showing that it was not supported by the evidence.

That such holding is a question within the purview of those with fact-find-

───────

[3] For a listing of cases suggesting that an illegal search may, on occasion, invalidate a confession, see footnote 4 to United States v DeLeo, 5 USCMA 148, 17 CMR 148, at page 162.

ing powers, is well established. United States v Alaniz, supra. However, in that same context, we might point out that if the confession be invalidated so too, we believe, should the accused's disclosure of the hiding place of the remainder of the knives, for this action amounted to a statement of a confessional nature (cf. United States v Taylor, 5 USCMA 178, 17 CMR 178) and stands on the same plane as the confession, especially where it preceded the confession in point of time.

We are faced then with deciding whether there was an admissible substitute for the evidence of ▇▇▇▇▇▇ ▇ record to show probable cause for the search. Major Henderson, the authorizing officer or some other witness, could supply this or other incriminating evidence. Cf. Giordenello v United States, 357 US 480, 2 L ed 2d 1503, 78 S Ct 1245 (1958). We do not choose to speculate on the Government's reasoning for not calling additional witnesses.

We therefore answer the second certified question in the affirmative—a rehearing may be ordered. On rehearing, the question of the lawfulness of the search may be further developed and ruled on as an interlocutory matter. A determination may then be made as to whether there is an issue for the fact finders, as indicated above.

The decision of the board of review is affirmed.

Judge FERGUSON concurs.

QUINN, Chief Judge (dissenting):

The principal opinion admits that if evidence of the informant's reliability was conveyed to Major Henderson, there was probable cause for the search. No other conclusion is possible.

The Air Police knew the Rod and Gun Club was broken into and looted of twelve hunting knives. A few days after the crimes, they were informed the accused was the culprit, and that he still had possession of the stolen property. If the informant had testified at trial, his testimony and evidence of the forced entry into, and looting of, the Club would support accused's conviction for housebreaking and larceny. See United States v Dammerich, 9 USCMA 439, 26 CMR 219. The total evidence available to the police, therefore, was more than enough to establish probable cause for the arrest of the accused and a search of his effects. Consequently, the issue is not the absence of facts showing probable cause, but whether there was a "substantial basis for crediting" the information that the accused was in possession of the stolen property. See Jones v United States, 362 US 257, 269, 4 L ed 2d 697, 707, 80 S Ct 725, 735 (1960).

To put the problem in its proper perspective, it is important to note at the outset that we are not dealing with the kind of evidence to credit the report which would satisfy "legal technicians," but with that which would lead reasonable and prudent men to conclude the information was not false or a mere reckless tale. Brinegar v United States, 338 US 160, 175, 93 L ed 1879, 1890, 69 S Ct 1302, 1310 (1949). On what basis does a reasonable and prudent person act on information supplied by another? Two broad bases immediately suggest themselves: (1) The informant is considered reliable; and (2) available independent information corroborates that supplied by the informant. My brothers imply these are only bases. I disagree with the implication, but at this point I need not go beyond the comments in the footnote below.[1] What is important here is the ruling that a policeman must disclose to the officer empowered to authorize a search "the source of his information or furnish . . . corroboration for his belief that this information might be accurate." In the absence of an attack on the truthfulness of the policeman's representation of facts reported to him, the necessity for disclosure of its

---

[1] Suppose a person previously unknown to a police officer rushes up and informs the officer that he has just seen a man drag the bleeding body of a woman into an apartment in a nearby building. Must the officer first conduct a preliminary investigation into the informant's reliability or obtain corroborating information before he acts on the report?

source was expressly rejected by the United States Supreme Court in the *Jones* case, supra, which is so heavily relied upon as support for the majority's ruling. The Supreme Court said:

"Petitioner argues that the warrant was defective because Didone's informants were not produced, because his affidavit did not even state their names, and Didone did not undertake and swear to the results of his own independent investigation of the claims made by his informants. If the objections raised were that Didone had misrepresented to the Commissioner his basis for seeking a warrant, these matters might be relevant. Such a charge is not made. All we are here asked to decide is whether the Commissioner acted properly, not whether Didone did. We have decided that, as hearsay alone does not render an affidavit insufficient, the Commissioner need not have required the informants or their affidavits to be produced, or that Didone have personally made inquiries about the apartment, so long as there was a substantial basis for crediting the hearsay." [Jones v United States, 362 US 257, 271, 272, 4 L ed 2d 697, 708, 80 S Ct 725, 736 (1960); see also United States v Walker, 307 F2d 250 (CA 4th Cir) (1962); cf. United States v Pearce, 275 F2d 318 (CA 7th Cir) (1960).]

Turning to the necessity for corroboration, I am afraid the majority misconstrue the cases. It is indeed true the Supreme Court said in the *Jones* case, as quoted in the principal opinion, that probable cause can be established by "information received through an informant . . . so long as the informant's statement is reasonably corroborated by other matters within the officer's knowledge." The comment does not, however, establish a new requirement for determining the reliability of hearsay showing probable cause for a search; it merely summarized the particular factual situation in Draper v United States, 358 US 307, 3 L ed 2d 327, 79 S Ct 329 (1959), in which the report was made by a paid informer whose trustworthiness would, in the first instance, be suspect. Cf. United

States v Scoles, 14 USCMA 14, 33 CMR 226. In context, the remark implies no more than the common understanding that a prudent person would normally not act on information furnished by one whose *known* conduct tends to discredit his credibility, without at least some verification of the reliability of the information. Similar caution would normally be expected as to information furnished by an "anonymous caller," which is all that the Court of Appeals for the Ninth Circuit held in the *Costello* case, also cited by the majority.

The credibility of a known cheat, pervert, drug addict, and the like, is initially suspect. The layman as well as the lawyer recognizes the damaging effect on credibility of previous acts of moral turpitude, or the commission of serious crimes. See United States v Keleher, 14 USCMA 125, 33 CMR 337. Consequently, information supplied by such persons would not normally be believed by a reasonable and prudent man, without some independent basis for crediting the hearsay. Information received from informants *not known* to be engaged in conduct tending to undercut their credibility stands upon an entirely different footing.

Public responsibility generally, and Federal law specifically, encourage a person having knowledge of the commission of a felony to disclose his information to enforcement authorities. See 18 USC § 4. A policeman has the right to accept at face value the truthfulness of a citizen's report, unless there are circumstances in the report itself or surrounding the informant which tend to discredit his information.

I abhor arbitrary and capricious action by the police, but I reject categorically the idea that they must initially treat information received from an ordinary citizen, about the criminal activity of another, as nothing but a "reckless or prevaricating tale." See Jones v United States, supra, 362 US at page 271. I reject the assumption implicit in the majority opinion that such persons must initially be considered downright liars, or reckless with the truth, when they report information to the police. I refuse to read into the

constitutional prohibition against unreasonable search and seizure, a rule requiring corroboration of the reliability of a report of crime by a person not himself suspected of crime or falsehood.

The Constitution is designed to protect the individual against autocratic and capricious intrusion by the Government. The invaluable right to individual privacy should not be perverted into an instrument of suspicion of those who enforce the law. A police officer, or an officer authorized to order a search, has the right, and should be expected as a reasonable person, to act on inherently credible information relating to a crime received from an identifiable person *not known* to be engaged in conduct tending to discredit his reliability. In other words, the report of crime by an ordinary person has built-in credibility. So much for my disagreement with the rule of corroboration subscribed to by the majority.

I now turn to this case, and the hearsay information that the accused had possession of the fruits of the crime. It is worth repeating that the facts unmistakably show probable cause. The only question is whether Major Henderson had sufficient reason to believe the facts were reliable. What did he have before him to lead him to conclude that they were? There was at least one matter of obvious importance.[2] He had before him a police officer asking for authority to search. It seems to me that a policeman who applies to the legally designated authority for permission to conduct a search is not bent on any arbitrary invasion of the suspect's personal rights. On the contrary, the officer is patently trying to carry out his duties within the strict requirements of the law. Consequently, when Strodomski represented that he had information the accused was in possession of the stolen knives, Major Henderson *could* reasonably infer that Strodomski believed his information was reliable and

true. Otherwise he would not have come. True, some police officers may lie; but the exception does not undermine the rule. In any event, if I go too far in according to the police the benefit of an inference of honesty of purpose which would be accorded another person under the same circumstances, then there is ample other evidence of reliability to support Major Henderson's authorization to search.

Strodomski testified he knew Raymond had asked the Office of Special Investigations for the informant's name, but they would not disclose it to him. He also testified that while he did not tell Major Henderson the informant had actually seen the accused with the stolen knives, he did tell the Major "practically the same thing" Raymond had earlier told him. This testimony supports the conclusion that Strodomski told the Major his information came from the Office of Special Investigations. Now what evidence did Major Henderson have to indicate that the Office of Special Investigations considered the informant reliable? I suggest that a conclusion of reliability is completely justified from the fact that the Office of Special Investigations passed on the information in positive terms to the Air Police. In Williams v United States, 308 F2d 326, 327 (CA DC Cir) (1962), the Court of Appeals for the District of Columbia Circuit pointed out that "in a large metropolitan police establishment the collective knowledge of the organization as a whole can be imputed to an individual officer when he is *requested or authorized by* superiors or *associates to make an arrest.*" (Emphasis supplied.)[3] The same can be said of the military police organization. Consequently, since Major Henderson apparently knew the circumstances under which the agent of the Office of Special Investigations gave the information to Raymond, he could conclude the Office of Special In-

---

[2] My brothers say the Government concedes that no evidence of reliability was *presented* to Major Henderson. I believe they misconstrue the Government's brief; but even if they don't, the Government, in fact, contends Major Henderson had good reason to believe

probable cause existed for the search. In my opinion, that contention is correct.

[3] It is significant that neither defense counsel at trial, nor my brothers, question the validity of the accused's arrest.

vestigations believed the report was reliable. And there is still other evidence of reliability.

Raymond testified that when he received the information from the Office of Special Investigations, "they seemed to think it was reliable." Raymond passed on to Strodomski "exactly" the information he received. Strodomski in turn told Major Henderson "practically the same thing" he learned from Raymond. It is reasonable to infer, therefore, that the Major was advised of the attitude of the Office of Special Investigations toward the reliability of the information. I have already pointed out that in the absence of an attack on its truthfulness, a police officer's representation that he believes the information received from an informant is reliable, is sufficient to justify issuance of authority to search. Jones v United States, supra, 362 US at page 271; see also United States v Walker, supra, page 252. The record, therefore, demonstrates that both the Air Police and Major Henderson had a "substantial basis for crediting the hearsay" report that the accused had possession of the fruits of the crime.

I would sustain the president's ruling on the validity of the authority to search, and return the record of trial to the board of review for further consideration of the merits.