UNITED STATES, Appellee

v

CHARLES H. HARTSOOK, III, Specialist Five,
U. S. Army, Appellant

15 USCMA 291, 35 CMR 263

*Captain James A. Buttry* argued the cause for Appellant, Accused. With him on the brief were *Colonel Joseph L. Chalk* and *Lieutenant Colonel Jacob Hagopian.*

*First Lieutenant Frank J. Penna* argued the cause for Appellee, United States. With him on the brief were *Colonel Edwin G. Schuck, Lieutenant Colonel Francis M. Cooper,* and *Captain Joel Robinson.*

## Opinion of the Court

KILDAY, Judge:

The accused was convicted of larceny of $1,000.00, in violation of Article 121, Uniform Code of Military Justice, 10 USC § 921, and sentenced to a bad-conduct discharge, total forfeitures, and confinement at hard labor for one year, and reduction to the grade of Private E–1. Intermediate appellate authorities approved and affirmed the findings and sentence without change.[1] We granted his petition for review to consider the following issue:

> Whether the officer who authorized the search was sufficiently informed of "the things to be seized" as required by law.

An altered bingo card was the instrument by which the Government alleged that the appellant committed the offense charged. The card in question is manufactured in two parts with numbers on the inside of the back of the card and corresponding openings, sealed off by isinglass windows, in the face of the card. Depression of a lever under each opening in the face of the card blocks out the appropriate number as it is called. The two pasteboard parts of the card are sewn together in an obvious attempt to prevent tampering.

On the evening of August 14, 1963, a bingo game was being conducted at the Top Five Grader's (Toppers) Club located in Frankfurt, Germany. The main event was the "coverall" game in which the player must cover (block out) all of the numbers on his card within the calling of fifty-four numbers. If the winner had an orange card his prize was to be $500.00 and $1,000.00 would go to the user of a green card. The difference in prize money reflected exactly the difference in the purchase price of the cards.

When Sergeant Raymond Banks, a qualified bingo expert, called the fifty-fourth number, the appellant called "Jackpot" and came forward with his card. He presented the card to a helper associated with the calling of the game, and the helper carried the card to Sergeant Banks. The card was then examined by Sergeant Banks to determine that it was purchased that evening and for possible evidence of tampering. Everything seeming to be in order, he then called upon three disinterested members of the audience to recheck the numbers called with the numbers on the card. When the numbers were found to tally, Sergeant Banks announced that the game had been won and thereupon took the card to Sergeant Davis, night manager of the club, and told him to " 'Make sure it's cut open and checked.' "

In accordance with house operating procedure, Sergeant Davis secured from the appellant certain personal identifying data and informed him he could call the next day and secure a

---

[1] The Secretary of the Army, in accordance with administrative procedures, on September 28, 1964, suspended the unexecuted portion of the sentence as initially promulgated, provided the accused reenlisted upon completion of the military retraining program.

check for the winning amount from the club custodian. The card, along with these data were then left by Davis on a desk or table in the office of the club custodian, Master Sergeant Sattler. Davis also checked the card for possible evidence of tampering with negative results.

Master Sergeant Sattler, who was not present in the club on the night in question, found the material left for him by Sergeant Davis, on a table in his office on the following morning. At Sattler's direction a check for $1,000.00 was made out to the appellant and presented to the latter by Sattler later that day when the appellant arrived to collect his winnings. Sattler also examined the card but was unable to observe any evidence of tampering. When he left his office that day, the card remained on the aforementioned table.

On the following morning Sergeant Banks appeared in Sattler's office and requested permission to examine the card on which the jackpot had been won. Banks and Sattler examined it together and with a little effort Banks was able to separate the front from the back on one side. A quick examination of the interior disclosed that the original numbers had been removed and others inserted and that the card had been resealed by use of two-sided gum tape. The Criminal Investigations Detachment were thereupon called, the matter was reported, and the card was turned over to them.

On August 22, 1963, CID agents Todd and Wood interviewed the appellant and searched his room and equipment, obtaining by reason of this search certain articles which were admitted in evidence against the appellant.[2] It is this search which is the basis for the grant at issue.

Prior to the interview of the appellant and search of his quarters, the agents testified, they approached the Battalion Commander, Colonel Cartwright, and informed him of the information they had received from the Toppers Club. They showed Colonel Cartwright a facsimile of the altered card and "told him that we would like to talk to Specialist Hartsook and if possible to shake his property down and see what we could determine." They were told to go ahead and to check in with the Battery Commander, Lieutenant Fritz. They proceeded to the Battery area and found the appellant in the orderly room. He was taken to another room, read Article 31 by Agent Wood and informed that he was suspected of larceny through use of an altered bingo card. At this time, Lieutenant Fritz arrived and he was advised by Agent Todd "what we were doing, who we were, and what we would like to do." Lieutenant Fritz wasn't opposed to their searching and in fact went along and, at the agent's request, initialed some of the items taken by them.

When trial counsel attempted to introduce these items into evidence, defense counsel objected on the ground that the search was not properly authorized by those empowered to do so. In a lengthy out-of-court hearing, the issue as to the fact of authorization by either Colonel Cartwright or Lieutenant Fritz, or both, was thoroughly explored and decided adversely to the appellant by the law officer. What was not so clearly determined, however, was whether, on the basis of the data supplied to them by the CID, either of these officers was sufficiently informed of *the things to be seized* and the grounds for believing these things might be located in the place to be searched in order to be in a position to lawfully give authorization to search.

On the question of search and seizure, the Fourth Amendment to the Constitution explicitly provides that:

". . . no Warrants shall issue, but upon probable cause, supported by Oath or affirmation, and particularly describing the place to be searched, and the persons or *things to be seized*." [Emphasis supplied.]

Because the issue in the case at bar is one involving a fundamental con-

---

[2] At all times the appellant has denied tampering with the bingo card through which he was declared the winner of $1,000.00.

stitutional right guaranteed by that Amendment, we are constrained to view liberally the constitutional prohibition in order that such rights be adequately and fully protected. United States v Lefkowitz, 285 US 452, 76 L ed 877, 52 S Ct 420 (1932). See also Nathanson v United States, 290 US 41, 78 L ed 159, 54 S Ct 11 (1933).

In Marron v United States, 275 US 192, 196, 72 L ed 231, 48 S Ct 74 (1927), the Court said:

"The requirement that warrants shall particularly describe the things to be seized makes general searches under them impossible and prevents the seizure of one thing under a warrant describing another.

• • •

"And the Congress in enacting the laws governing the issue and execution of this search warrant was diligent to limit seizures to things particularly described."

In Federal civilian practice, the issuance of a warrant to search, and other matters attendant thereto, are governed by Rule 41 of the Federal Rules of Criminal Procedure. Therein, certain specifically designated committing magistrates are granted authority to issue warrants. In military law, however, there is no provision for the issuance of a warrant to search. Power to authorize a search is within the province of the commanding officer, including an officer in charge. Paragraph 152, Manual for Courts-Martial, United States, 1951. In this context he stands in the same relation *vis-a-vis* the investigating officer and an accused as the Federal magistrate. And we have so equated him. United States v Ness, 13 USCMA 18, 32 CMR 18; United States v Battista, 14 USCMA 70, 33 CMR 282; United States v Davenport, 14 USCMA 152, 33 CMR 364.

While he issues no warrants, the commanding officer is bound by the same rules in authorizing a search as his opposite number; that is, probable cause to believe that the things to be seized are on or within the premises to be searched. As we stated in United States v Ness, supra:

". . . a search based on a warrant is invalid if probable cause does not appear in the facts presented to the officer issuing the warrant. See Jones v United States, 362 US 257, 4 L ed 2d 697, 80 S Ct 725 (1960); Johnson v United States, 333 US 10, 92 L ed 436, 68 S Ct 367 (1948); United States v Brown, 10 USCMA 482, 28 CMR 48." [United States v Ness, supra, at page 22.]

It is a natural corollary, therefore, that the commanding officer must be informed to the same extent as his Federal counterpart prior to granting authority to search.

Where an affidavit, establishing the grounds for issuing a warrant, has been sworn to before the proper authority, and is available for review, no problem exists as to the basis for the latter's determination that probable cause existed. Jones v United States, 362 US 257, 4 L ed 2d 697, 80 S Ct 725 (1960). But where, as in the military, authorization generally is granted on a mere verbal presentation, the issue must necessarily be determined through the taking of extensive testimony. This is often a difficult method of procedure for in most cases trial is held some period of time later and all concerned must rely on their memories to recall just what information was supplied and received. On occasion, the data and testimony available is not sufficient for a proper determination and on appeal we have had to return the case for a rehearing on this issue. United States v Davenport, supra.

The fundamental philosophy behind the requirement that where an immediate need to search is not clearly evident, a warrant to search is required, is succinctly stated in Jones v United States, supra:

". . . so that the evidence in the possession of the police may be weighed by an independent judicial officer, whose decision, not that of the police, may govern whether liberty or privacy is to be invaded."

294

[Jones v United States, supra, at pages 270 and 271.]

As we have indicated, in military law the "independent judicial officer" is the commanding officer to whom application for authority to search is made and it is his decision and not that of the investigating officers which governs "whether . . . privacy is to be invaded." He personally weighs the evidence and determines the existence of probable cause.

"Under the Fourth Amendment, an officer may not properly issue a warrant to search a private dwelling unless he can find probable cause therefor *from facts or circumstances presented to him* under oath or affirmation. Mere affirmance of belief or suspicion is not enough." [Nathanson v United States, supra, 290 US, at page 47.] [Emphasis supplied.]

Unless the authorizing officer exacts from the investigator a description of the property sought, there █ is no guarantee that the search will not be one solely for the purpose of securing evidence of crime, as opposed to a search for instrumentalities, fruits of the crime or contraband. Exploratory searches for evidence of crime have long been condemned by the Supreme Court. Go-Bart Importing Co. v United States, 282 US 344, 75 L ed 374, 51 S Ct 153 (1931); United States v Lefkowitz, supra; Harris v United States, 331 US 145, 91 L ed 1399, 67 S Ct 1098 (1947); Gouled v United States, 255 US 298, 65 L ed 647, 41 S Ct 261 (1921). Cf. Marron v United States, supra. See also in this Court, United States v Vierra, 14 USCMA 48, 33 CMR 260; United States v Battista, 14 USCMA 70, 33 CMR 282. Obviously an authorizing officer cannot distinguish between "evidence" and those things which may be legally searched for if he does not know the nature of the items sought by the investigators. "As to what is to be taken, nothing is left to the discretion of the officer executing the warrant." Marron v United States, supra, 275 US, at page 196.

In deciding whether the property sought is described with sufficient particularity, civilian courts look to both the warrant and the affidavit issued in support thereof. United States v Snow, 9 F2d 978 (D Mass) (1925). Failure to describe the property to be seized even in a most general way has been the basis for reversal. Rice v United States, 24 F2d 479 (CA 1st Cir) (1928); Woods v United States, 279 Fed 706 (CA 4th Cir) (1922); Giles v United States, 284 Fed 208 (CA 1st Cir) (1922). "Technical precision of description is not required," but "when dealing with property which is inherently innocuous, the affidavit and warrant should contain at least a designation by general terms of the class, or classes, of property to be searched for and seized." United States v Quantity of Extracts, Bottles, Etc., 54 F2d 643, 644 (SD Fla) (1931). For cases where property "inherently innocuous" was not sufficiently described, see Alioto v United States, 216 F Supp 48 (ED Wisc) (1963); Weinberg v United States, 126 F2d 1004 (CA 2d Cir) (1942); Stanford v Texas, 379 US 476, 13 L ed 2d 431, 85 S Ct 506.

This requirement is distinct from that of probable cause, although the same facts may in a given case satisfy both requirements, the two usually being interrelated, and the Government must nonetheless show compliance with both if the search and seizure are to be justified. United States v Wroblewski, 105 F2d 444 (CA 7th Cir) (1939); Lowrey v United States, 161 F2d 30 (CA 8th Cir) (1947), cert den, 331 US 849, 91 L ed 1858, 68 S Ct 1731. In *Wroblewski* the court stated that:

"We construe the language of the Fourth Amendment to mean that no warrant shall issue (1) unless there is a showing of probable cause supported by oath or affirmation, and (2) unless the warrant particularly describes the place to be searched and the things to be seized." [United States v Wroblewski, supra, at page 447.]

And in *Lowrey:*

". . . Of course, probable cause for the issuance of a search warrant necessarily implies, not simply that there are reasonable grounds to believe that some violation of law exists, but that there is a violation in respect to some property located on some premises or on some person—each of which can be unmistakably identified, so as to be capable of being particularly described in the warrant, from the information in the affidavit. Cf. Dumbra v United States, 268 US 435, 441, 45 S Ct 546, 69 L ed 1032." [Lowrey v United States, supra, at page 33.]

Having no warrant or affidavit available for perusal, our determination of the issue before us must turn on the data in the record of trial. Looking first to the testimony of the investigators, we find Agent Todd testified that he and Agent Wood told Colonel Cartwright "what we were investigating, and we told him what information we had received and what we were interested in . . . we told him that we would like to talk to Specialist Hartsook and if possible to shake his property down and see what we could determine." Agent Wood's recollection of this encounter is that "we advised . . . [Colonel Cartwright] the reason we were there, and he told us to go ahead and carry on with our business."

With reference to Lieutenant Fritz, Agent Wood stated that it was Mr. Todd who received the Lieutenant's permission to search. Todd testified that:

"I told Lieutenant Fritz who we were, I told him we were from Frankfurt, that we were investigating a report of an altered bingo card . . . of a person using an altered bingo card in the First Five Graders Club in Frankfurt, a check was issued to a man identified as Hartsook, and we had checked and we found that there was a Hartsook by the same name and serial number in his organization.

. . . . .

"I asked Lieutenant Fritz, I said

we would like to search his property; and he said yes."

Todd also testified he had revealed to Colonel Cartwright "the nature of . . . [his] evidence." He told him about the altered bingo card and also divulged all the facts he had available. When asked by trial counsel whether he believed he would find something in Hartsook's gear, Todd replied, "I had no idea. This was the idea, to look for something." Thereupon trial counsel immediately inquired:

"Q Something that may have been used in the commission of the crime?
"A Yes sir.

"Q Such as glue?
"A Yes sir.

"Q Or a knife?
"A Yes sir.

"Q Or other bingo cards?
"A Yes sir."

In reply to inquiry by defense counsel, Lieutenant Fritz testified in pertinent part as follows:

"Q Do you remember Mr. Todd and Mr. Wood coming to see you on the 22d of August?
"A Yes sir, I do.

"Q Just what did they tell you when they came to see you?
"A They came into my office and told me they had an incident concerning a member of the Battery. And then they proceeded to tell me what it was about, concerning the incident, the card . . . you want me to go through . . .

"Q No. Did they request your assistance in any way?
"A No sir.

"Q Did they request you to make a search?
"A They requested to search, they asked me to go with them.

"Q They didn't ask your permission to search, did they?
"A (Pause)

"Q Or did they tell you they were going to search?
"A They said, 'We would like to'—I believe the wording they used,

'We would like to search his equipment and we would like to have you accompany us.' And I said, 'All right', and I had the first sergeant go get Hartsook.

. . . . .

"Q Did you know you were giving permission to search? Did you know you had authority to give permission?

"A I didn't realize at that time that I could deny them, I guess.

"Q Let's ask this . . . oh, go ahead.

"A I knew—if there wasn't grounds for a search I knew I could prohibit them from searching, if I didn't feel that he should be searched.

"TC: So you thought there was grounds here?

"WITNESS: Yes, I thought there was.

. . . . .

"Q Did they ask your permission to search, or did they merely ask you to come along while they searched?

"TC: He testified about five times what they said.

"A They said, what I told you, that they would like to search for the reasons, after telling me what the situation was, they said they would like to look at his personal belongings and anything in the billets, and they would like to have me accompany them. And I said, 'All right, I'll go with you, I'll get the first sergeant to get Hartsook.'

. . . . .

"RECROSS EXAMINATION

"QUESTIONS BY THE PROSECUTION:

"Q You say that Mr. Todd told you about the bingo card?

"A Yes sir, he explained—

"Q Did he say it was a fixed bingo card?

"A Yes sir.

"Q What did he tell you?

"A Sir, he told me about the card, how it had been cut and the numbers had been cut out and placed in,

and he told me that the card that won the bingo, the night that Hartsook won the thousand dollars he said the card that won that night they said they had reason to believe it was the card that had been tampered with.

"Q Did they tell you Hartsook had collected a thousand dollar check?

"A Yes sir.

"Q And at that time did you believe it was possible that Hartsook maybe had done something?

"A (Pause)

"Q I mean, did this evidence seem to you like grounds for search?

"A Oh, yes sir.

"Q There was no doubt in your mind but what this would appear reasonable, to inquire further into the facts by conducting a search, is that right?

"A The evidence that he told me, yes sir.

. . . . .

"Q Based upon the evidence presented to you by the CID agents, did there seem to be any reason to deny them the right to search?

"A No sir.

"TC: No further questions."

Following Lieutenant Fritz' testimony, a colloquy ensued between the law officer and trial and defense counsel over the question of whether a consent to search had been granted. In an effort to further clarify the matter, the law officer recalled Mr. Todd and defense counsel inquired:

"Q Just what did Colonel Cartwright say?[3]

"A We told Colonel Cartwright, actually we talked to Colonel Cartwright for sometime, and we talked to Major Spitler who I believe was the executive officer, he was present all during the time we talked to Colonel Cartwright.

"We told Colonel Cartwright everything that we had, we told him

[3] Colonel Cartwright did not testify as he had been rotated back to the United States at time of trial.

that we would like to talk to Hartsook, *we told him that we would like to search his property for anything that we may find. He told us that we can do anything we want to do.* . . .

. . . . .

"QUESTIONS BY THE PROSECUTION:

"Q Did you believe that you had permission from Colonel Cartwright to search?

"A I believe that I had permission from both Colonel Cartwright and Lieutenant Fritz.

"Q And Lieutenant Fritz?
"A Yes.

"Q When you said to Lieutenant Fritz, 'May we search Sergeant Hartsook's stuff' and 'Will you accompany us?', and he said, 'Yes,' you considered that a consent?
"A This is plenty of consent." [Emphasis supplied.]

It was Major Spitler, testifying in the place of the absent Colonel Cartwright and at the request of defense counsel, who stated that when agents Todd and Wood were talking with Colonel Cartwright, they had in their possession an altered bingo card

". . . which they had taken apart and moved some numbers around to show me that this could be done, and it had some tape on it to show me that the tape could be made to hold this together, the numbers could be cut and glued back in, and things of this nature; and explained to me carefully that this was not a piece of evidence but was a training aid that they had made up to demonstrate and to explain what they were there for.

. . . . .

"Q Did the agents acquaint Colonel Cartwright—
"A Yes, Colonel Cartwright was very well acquainted with the situation as it existed then and before the agents left the office."

Upon recall, Agent Wood related their use of the facsimile of the altered bingo card at Colonel Cartwright's office and testified that we

"informed . . . [Colonel Cartwright] that we would like to go to the Battery area and talk to Specialist Hartsook and search his property. Whereupon Colonel Cartwright told us to go ahead."

It is readily apparent that we have found it necessary to set forth in quite some detail the testimony of these various witnesses in order to present as full and complete a picture as possible of the pertinent data concerning this issue, because of the unavailability of some document, such as a written authorization to search, reflecting the basis upon which the authorization was granted. While no such document is required in military jurisprudence, its value both at trial and on appellate review is readily apparent.

The totality of the above testimony leaves considerable doubt as to whether either Colonel Cartwright or Lieutenant Fritz was sufficiently informed within the meaning of the Fourth Amendment. The agent's statement to Colonel Cartwright that they would like "to shake his [Hartsook's] property down and see what we could determine"; "for anything we may find"; and Lieutenant Fritz' recollection that they said "they would like to look at his personal belongings and anything in the billets," describes the classic case of the general, exploratory search condemned by this constitutional provision. Go-Bart Importing Co. v United States and United States v Lefkowitz, both supra. In addition, Agent Todd was initially unsure of whether he would find anything in this search, for, in answer to trial counsel's inquiry, he replied, "This was the idea, to look for *something*." (Emphasis supplied.) True enough, he later agreed he was looking for something that may have been used in the commission of the crime, such as, "glue," a "knife," or "other bingo cards." However, the question to be resolved is whether Colonel Cartwright or Lieutenant Fritz authorized the search on this latter basis or whether they were in fact granting authority to conduct a general, explora-

tory search. The test is not what was in the mind of the investigator but whether evidence sufficient to justify the search is placed before the authorizing officer by those requesting his permission. Jones v United States, supra. See also Baysden v United States, 271 F2d 325 (CA 4th Cir) (1959).

In this connection, we note that the agents told Colonel Cartwright "what we were interested in." And Lieutenant Fritz "knew—if there wasn't grounds for a search I knew I could prohibit them from searching, if I didn't feel that he should be searched." While this is hardly declaratory of the *things to be seized*, it is some indication, albeit slight, that the search may have been validly authorized. At least, in the state of this record, where the precise issue has not been litigated at trial level, we are not prepared to hold to the contrary without further inquiry. On rehearing, the question of the lawfulness of the search may be further developed and ruled on as an interlocutory matter. Cf. United States v Davenport, supra.

Accordingly, the decision of the board of review is reversed. The record of trial is returned to The Judge Advocate General of the Army for action not inconsistent with this opinion.

Judge FERGUSON concurs.

QUINN, Chief Judge (dissenting):

I have disagreed with my brothers in so many search and seizure cases that I approached this case with a desire to accommodate my views to theirs. But, unhappily, I cannot accept what I believe to be a half-Janus approach to the evidence.

Agent Todd testified that he gave Colonel Cartwright all the information he had about the suspected offense. More than that he had a facsimile of the fake bingo card used by the accused, and especially pointed out the kind of tape used and how the "numbers could be cut and glued

back in." According to Major Spitler, who was present at Todd's explanation, "Colonel Cartwright was very well acquainted with the situation." A limitation on the scope of the authority to search can be implied from the surrounding circumstances. United States v Ness, 13 USCMA 18, 23, 32 CMR 18. In the light of Agent Todd's meticulous particularization of the offense and the means of its accomplishment, I have no doubt whatever that Colonel Cartwright's authority to search was intended by him, and understood by Agent Todd, to be a search for articles connected with the preparation of the false card, not a search for anything and everthing that might somehow be criminal in nature. That is sufficient particularity to satisfy the Constitution's prohibition against general, exploratory searches. United States v Vierra, 14 USCMA 48, 52, 33 CMR 260. If more is required, it was provided by the presence of Lieutenant Fritz throughout the actual search. He had the power to authorize a search; he was fully apprised of the circumstances of the accused's commission of the alleged offense; and he testified he was convinced a search was necessary. He further testified he knew he could "prohibit them from searching," if a search was not warranted by the facts apparent to him. Where the necessity for a search is established and the officer empowered to authorize a search is present at the place of the search, an authorization "inchoate at issuance" may become full and unconditional in the execution of the search. United States v Ness, supra, at page 23.

I am satisfied that while they did not know precisely what instrumentalities of the crime might still be in the accused's possession, both the officers authorizing the search and the agents contemplated that the search would be limited to articles connected with the offense. I would, therefore, sustain the law officer's ruling on the admissibility of the evidence, and affirm the decision of the board of review.