UNITED STATES, Appellee

v

SIDNEY SAM, Private First Class, U. S. Army, Appellant

22 USCMA 124, 46 CMR 124

No. 25,677

February 2, 1973

*Captain Barry K. Duwe* argued the cause for Appellant, Accused. With him on the brief was *Colonel Arnold I. Melnick.*

*Captain Thomas W. Phillips* argued the cause for Appellee, United States. With him on the brief were *Lieutenant Colonel Ronald M. Holdaway, Captain Stan L. Spangler, Captain Richard L. Menson,* and *Captain Glenn R. Bonard.*

## Opinion of the Court

DUNCAN, Judge:

Appellant, Private First Class Sidney Sam, complains that at trial the military judge erroneously denied a motion to suppress evidence found upon his person and other evidence found in his clothing in his wall lockers. We find the search of his person to have been lawfully conducted, but that the search of the wall lockers was unlawfully authorized without the necessary showing of probable cause.

Specialist Four John D. Lyons was crossing an athletic field at Fort Hood, Texas, on February 2, 1971, when at about 8:45 p.m. three men robbed him of his wallet, which contained his military identification card, personal papers, and $54.00 in cash. Lyons was able to give only a rather vague general description of his assailants. He noted that one man wore a shiny black jacket and glasses, and another wore a brown-and-white plaid or checked jacket. Lyons was unable to describe the third man.

Sergeant Hamill and Private First Class Evans, military policemen, related to Criminal Investigator Hankins, who was investigating the crime, that three men were standing in the vicinity of the 13th Data Processing Detachment, at about 9:00 p.m. on February 2, 1971.[1] When Hamill got out of the vehicle and approached the three men, they ran. He chased one, and Evans chased two in the direction of the north side of the battalion area into one of the barracks of the 391st Signal Company. Evans described one man as wearing grey pants, another wearing a two-tone brown jacket, and the third a black leather jacket.

Sam and two men were observed in one of the barracks units of the 391st Signal Company at about 8:00 p.m. on February 2, 1971, by prosecution witness Specialist Five Robert J. White, who knew Sam.[2]

According to White, one of the persons with Sam wore a shiny black leather jacket, the other man a brown jacket, and Sam wore a beige bush jacket. Later White, the assistant charge-of-quarters that night, at about 8:45 p.m., after being advised by the military policemen that there had been a robbery, went from the orderly room back into the barracks and talked to a man who described two men who were pursued into the barracks. White indicated that the descriptions furnished "seemed to fit the same two men that I saw with Sam in the barracks earlier."

Investigator Hankins interviewed appellant on February 10, 1971. Apparently with Sam's consent, Hankins examined and then photographed a wallet Sam had on his person.[3] Hankins noticed that the wallet was limber as if it had held more contents at one time, but found nothing in it indicating that it belonged to the robbery victim.

The photograph, approximately 3/4" by 1/4" in size, was shown to Lyons. Lyons testifying about the photographic identification stated:

"Q. How do you recognize it?
"A. The wallet—the shape of the

---

[1] Without objection Hankins testified regarding the information he received from interviewing Hamill and Evans.

[2] White testified that he had talked to Sam "a few times" and "[knew] him fairly well."

[3] Hankins testified that prior to any interrogation the appellant was fully advised of his rights from a rights card. The defense did not object to the admission in evidence of the photograph of the wallet.

wallet, and the small gold insignia on the inside.

"Q. When you saw that wallet, were you able to identify it?

"A. Yes, sir.

"Q. And how were you able to identify it?

"A. By the gold insignia, and the shape of the wallet itself, sir.

"Q. Does the wallet appear to be the same one that was stolen from you? on the 2nd of February?

"A. Yes, sir."

Lyons also explained, "when you have a wallet for eight months you kind of know what's yours."

Hankins, seeking authority to conduct a search, advised Colonel Roberts, the brigade commander, of the information gained from his investigation. Hankins told the commander what he had learned from White; however, Colonel Roberts apparently misunderstood the conversation with Hankins in that he believed that appellant, wearing a light-colored jacket, had been observed in the barracks after the robbery. Thus, Roberts apparently did not understand that it was before the incident that Sam was present in the barracks at about 8:00 p.m. and observed by White wearing a beige jacket.

According to Hankins, he told Roberts that the object of his search would be to locate property that came from the victim's wallet. Roberts testified concerning the objects of and the extent of the search:

"Q. . . . What was your idea of the object or objects that the investigator was looking for in the course of the search?

"A. Two specific items, a light-colored jacket, and the wallet. As far as I know, other items could, or may have been discussed but I remember these two, because these were two which did give me a basis of having specifics in mind.

. . . . . .

"Q. And what was authorized to be searched?

"A. The individual, his personal belongings, and his equipment."

Roberts also observed, "the reason I included the items on his person was the fact of the wallet that had been photographed." Roberts related that Hankins told him that Lyons, while not making positive identification, identified the wallet as similar to the one that had been taken.

After receiving authority to search, Hankins, with the accused present, first searched the accused's clothing found in his wall lockers and found marihuana cigarettes in a cream-colored jacket. Another investigator found a marihuana cigarette in a pair of fatigues. Hankins, for a reason unexplained, then searched appellant's person. The search revealed the same wallet he had photographed earlier. Inside was a military identification card belonging to Lyons. Later, at the Criminal Investigations Detachment office, the appellant confessed in writing to having committed the robbery.

Although a commanding officer in determining whether to order a search in the military stands in the same position as a Federal magistrate issuing a search warrant, common sense leads us to appreciate the difficulty he may tend to experience in viewing his decision with a magistrate's neutrality and detachment. Therefore, we must review his authorizations to search and seize with careful scrutiny. United States v Hartsook, 15 USCMA 291, 35 CMR 263 (1965); United States v Davenport, 14 USCMA 152, 33 CMR 364 (1963); United States v Battista, 14 USCMA 70, 33 CMR 282 (1963). Occasionally, as in the instant case, our responsibility requires us to review a commander's challenged probable cause determination by giving attention to the impact of his use of erroneous facts at the time of his authorization to search. See Rugendorf v United States, 376 US 528, 11 L Ed 2d 887, 84 S Ct 825 (1964); Note, *Testing the Factual Basis for A Search Warrant*, 67 Col L Rev 1529 (1967).

In the case before us, Colonel Roberts erroneously understood that the appellant was seen soon after the robbery in an area with others who had probably fled from the area where the crime had occurred. Secondly, the record does not indicate that the commanding officer understood that the earlier examination of the contents of the wallet did not reveal anything that would link it with the robbery. Holding in mind our duty of careful review for the existence of probable cause, has the commanding officer's misunderstanding and lack of knowledge of certain facts precluded a finding of its existence?

■ Notwithstanding the brigade commander's misunderstanding which led him to believe that Sam was seen in a barracks area after the military police chased two men in that direction, we regard the grant of authority to search appellant's person as lawful. Roberts was told and stated that he understood that Sam was in possession of a wallet identified as similar to the one taken from Lyons. Since Hankins informed him of the details of his investigation, which progressed to the point where Lyons viewed and identified the pictures of the wallet, Colonel Roberts had a substantial basis for crediting the information. He was told and understood that Lyons stated that the wallet in the photograph was similar to his. The progression of Hankins' investigation, which narrowed to Sam and motivated the calling of Sam for an interview, included the information provided by White. Robert's error in understanding what White told the investigator, although such information was important to Hankins in investigating Sam's involvement, is not so infectious that it debilitates the other correctly understood information presented concerning Sam's possession of the wallet to such an extreme that probable cause cannot be found. Probable cause standards must be reasonably high, but not so strict that each

and every detail of an investigation must be known and understood by a commanding officer. Obviously, the more information communicated in seeking authority to search the more enlightened the military magistrate's decision will be. However, the standard to be met is probable cause rather than perfect cause.

■ Prior to addressing the impact of the first examination of the wallet by the investigator, several other of appellant's contentions merit comment. Appellant urges that the information presented in seeking authority to search cannot be viewed as reliable since the commanding officer had no prior knowledge of the reliability of Hankins or those from whom he received information. The facts presented to the commanding officer furnish a basis from which he could determine that reasonable standards of reliability are met. The investigator personally having examined the wallet given to him by the appellant and then having taken a photograph of it to the victim for identification, clearly distinguishes this case from problems present in those situations where a law enforcement official seeking authority to search relates information gained from an unnamed informant.[4]

■ Next, the appellant argues that Lyons' identification of the wallet from the photograph was inadequate.[5] Is it required that such an identification be strictly positive before probable cause for a search exists? In these days of super mass production when identical objects are manufactured, the positive identification of such items as one's own often is impossible. Requiring such positive identification of personal property as a legal requirement to meet probable cause standards would tend to rule out grants of authority to search for many things which are otherwise of legitimate evidentiary value, solely on the happenstance that

---

[4] See United States v Davenport, 14 USCMA 152, 33 CMR 364 (1963).

[5] Appellate defense counsel also claim that the size of the photograph was so minute that identification of

the wallet was not possible. That question, a fact question, apparently was decided adversely to appellant's contention at the trial level.

many similar things are in existence elsewhere. We believe that the information concerning the wallet communicated to and understood by Colonel Roberts satisfies probable cause requirements of paragraph 152 of the Manual for Courts-Martial, United States, 1969 (Revised edition), which provides in part as follows:

"Probable cause for ordering a search exists when there is reason to believe *that items of the kind* indicated above as being properly the subject of a search are located in the place or on the person to be searched." [Emphasis supplied.]

■ We turn now to the commanding officer's apparent lack of knowledge that a prior examination of the wallet found on Sam's person did not disclose any fruits of the crime. As we read the record, Hankins' first search of the wallet appears to have been a consent search. The fact that the wallet, upon examination by Hankins earlier that day, did not contain any fruits of the crime did not render a subsequent search and seizure of the wallet, after identification of the wallet from a photograph by Lyons, without probable cause. We recognize the potential for unconstitutional encroachment upon Fourth Amendment rights in situations where the seizure of evidence is authorized again and again on the chance that it will eventually become incriminating to the suspect. Cf. United States v Kauffman, 14 USCMA 283, 34 CMR 63 (1963). Contrariwise, all second searches of the same person or property are not rendered unlawful merely because a prior search did not reveal the objects sought. The entire assemblage of facts must be reviewed on a case-by-case basis to determine whether the second intrusion is reasonable. Where, as here, significant relevant new information is discovered, the victim's identification of the wallet, probable cause to search and seize the wallet exists whether or not the commanding officer knew of the negative result of the search earlier that day. Moreover, since it was being carried by the appellant when Lyons identified it earlier in the day, reasonable grounds existed to believe that Sam had the wallet on his person later the same day.

■ We do not believe the fact that Hankins in his conduct of the search was primarily interested in examining Sam's belongings and some what intuitively or "playing a hunch" searched the appellant's person is indicative of a general search lacking probable cause. Admittedly under the facts of the case at bar, the search of Sam's person to some would appear of vast importance while to Hankins an afterthought, but we cannot rule that such motivation is the bane of probable cause branding it exploratory and unlawful. Appellant wisely calls our attention to this matter and we have considered it. However, we believe criminal investigators should employ their emotional sensitivity and follow certain seemingly unreasoned mental provocation in attempt to solve crimes so long as that activity does not violate rules of law or intrude into constitutionally protected areas which require products of their efforts to be excluded from evidence.

■ The uncomplimentary nature of provisions of military law which permit oral application and authority to search and seize is well demonstrated by other problems we confront in the case before us. We note that Hankins' testimony does not reveal that he specifically requested authority to search appellant's person for fruits of the crime. He stated that his *primary* concern was to search Sam's property in the barracks. Since the record is silent regarding whether Hankins' requested authority to search Sam's person, there is some uncertainty as to whether such authority was requested. Mere silence in the record in that regard does not give rise to a finding that the extent of the search was inapposite to that requested and as such an unreasonable general search. The authority to search Sam's person was clearly granted. Under these rather peculiar circumstances, we uphold the validity of the search of the person of appellant.

■ Further examining the total record, we simply do not find evidence indicative that Colonel Roberts had any

information that any of the fruits of the crime could be found among appellant's belongings and equipment in the barracks. Hankins stated that he was "looking for various items that might possibly have the name of the victim on it, such as a weapons card, or possibly a liberty pass." The record is void of any facts that such items probably could be found among appellant's belongings and equipment. Moreover, the facts adduced furnish no basis for drawing reasonable inferences that such items, in probability, were so located. Authority to search cannot be given unless some of the underlying circumstances that caused the person to believe the object of the search is where he thinks it is are disclosed. United States v Lidle, 21 USCMA 455, 45 CMR 229 (1972). Although a soldier's room or locker are often likely places to conceal items he does not wish discovered, the Fourth Amendment requires more than the joinder of this likelihood with the suspicion that he has committed a crime to justify a search of these places in the hope that evidence or fruits of crime may be discovered there. United States v Gibbins, 21 USCMA 556, 45 CMR 330 (1972); United States v Racz, 21 USCMA 24, 44 CMR 78 (1971). "An official should have more reason for authorizing the search of a particular place than that the item to be searched for was possibly in that place." United States v Alston, 20 USCMA 581, 583, 44 CMR 11, 13 (1971). Therefore, the marihuana found in his clothing prior to his arrest should not have been admitted into evidence.

Having reached the above conclusions, the appellant's confession to the robbery is untainted by illegally obtained evidence.

Private First Class Sam, offering no evidence in defense, was convicted by general court-martial of robbery and possession of marihuana, and sentenced to a dishonorable discharge, forfeitures of all pay and allowances, and confinement at hard labor for 50 months. The convening authority approved the sentence, and the Court of Military Review affirmed the findings of guilty and the sentence.

We affirm the finding of guilty of robbery. We reverse and set aside the finding of guilty of possession of marihuana. The record of trial is returned to the Judge Advocate General of the Army for action not inconsistent with this opinion.

Chief Judge DARDEN concurs.

QUINN, Judge (concurring in part and dissenting in part):

I agree that the search of the accused's person was properly authorized, but I disagree with the majority's conclusion that probable cause did not exist to justify a search of the accused's wall locker. Since the accused had possession of the stolen wallet, it was reasonable to conclude, in my judgment, that he also had some of the things the wallet contained when it was taken. As nothing belonging to the victim was in the wallet when it was examined by agent Hankins on the morning after the robbery, it was reacused's person was properly authorized, concealed the contents. His locker was a logical and probable place of concealment. See my opinion in United States v Moore, 19 USCMA 586, 590, 42 CMR 188, 192 (1970) and in United States v Alston, 20 USCMA 581, 584, 44 CMR 11, 13 (1971). I would, therefore, affirm the decision of the Court of Military Review.