UNITED STATES, Appellee

v

HUGH M. TUCKER, Technical Sergeant,
U. S. Air Force, Appellant

14 USCMA 376, 34 CMR 156

[black redacted blocks]

No. 17,170

January 31, 1964

[black redacted blocks]

*Major William A. Crawford, Jr.*, argued the cause for Appellant, Accused. With him on the brief was *Colonel Daniel E. Henderson, Jr.*

*Major Thomas J. Connolly* argued the cause for Appellee, United States. With him on the brief was *Colonel Emanuel Lewis*.

## Opinion of the Court

FERGUSON, Judge:

Arraigned and tried before a general court-martial convened at Barksdale Air Force Base, Louisiana, upon sixteen specifications of larceny, in violation of Uniform Code of Military Justice, Article 121, 10 USC § 921, accused pleaded guilty to the lesser included offense of wrongful appropriation. Subsequently, the law officer, in view of Tucker's testimony, set aside his plea as to specifications 1 through 5 of the charge and entered pleas of not guilty concerning these counts. The court-martial acquitted accused of specification 1, found him guilty of wrongful appropriation in connection with specifications 2 through 5, and guilty of larceny under specifications 6–16. It imposed a sentence of bad-conduct discharge, forfeiture of $65.00 per month for twelve months, confinement at hard labor for twelve months, and reduction to airman basic. The convening authority reduced the amount of forfeitures to $43.00 per month, but otherwise approved the sentence. The board of review affirmed. We granted ac-

cused's petition for review upon three issues which will hereinafter be set out and discussed. We have also been informed by appellate counsel that, on August 5, 1963, so much of accused's sentence as exceeded confinement at hard labor for four months and fifteen days and forfeiture of $43.00 per month for one month and twenty-eight days was remitted.

I

Basically, the charges against accused arose out of his alleged receipt, retention, and use of checks mailed to his home in payment of a basic allowance, to which he was not entitled by reason of being assigned to and occupying Government quarters during the period involved.

According to the evidence, Tucker originally was assigned Government quarters at Barksdale Air Force Base. His occupancy, however, was terminated on November 28, 1960, and, on December 14, 1960, he made application for an allowance in lieu thereof. As he

met the requirements of applicable statutes and regulations, the allowance was duly approved and, as is requisite, monthly checks were forwarded to his wife, Diana Tucker, in the amount of $176.90. On May 9, 1961, accused was again assigned quarters at Barksdale Air Force Base, and action was taken to terminate the allotment from his pay which made up a portion of the allowance paid his wife. He did not, however, execute the necessary form to have the allowance formally terminated. In this connection, it is worthy of note that the monthly deduction from accused's pay was accomplished locally while the allowance checks were forwarded to accused's wife from the Air Force Accounting and Finance Center, Denver, Colorado.

Despite the occupancy of Government quarters by accused and his family, the allowance checks continued to arrive monthly—apparently being forwarded from his former off-base address—and were duly cashed. They were variously endorsed with the name "Diana D. Tucker" alone or that name followed by that of the accused. An examiner of questioned documents testified that, in his opinion, the endorsement of Diana Tucker's name on the checks involved in specifications 1 through 4 was made by her. He also expressed the view that accused wrote the endorsement of his own name on the checks involved in specifications 2 and 4. He conceded, however, that it was possible for Diana Tucker also to have endorsed the accused's name on the checks.

In voluntary statements executed on November 5, 1962, and November 13, 1962, respectively, Sergeant Tucker admitted that he had received, endorsed, and cashed the allowance checks involved in specifications 6 through 16, although he was then occupying Government quarters. He declared that his wife, without his knowledge, received and negotiated the checks involved in specifications 1 through 5. At the time he moved into his quarters, a form was executed by the Base Housing Office which he understood would "automatically cancel" the allowance. He therefore took no further action to discontinue it.

Tucker further stated that his wife had been frequently hospitalized for a mental condition and he "used the money to pay bills because I had to take care of my children and pay a housekeeper." He "expected to get the matter straightened out" upon reenlistment in October 1962.

Accused elected to appear as a witness in his own behalf. According to his testimony, he moved on base on May 9, 1961. The Base Housing Office gave him executed forms recording his quarters assignment and directed him "to take them to the Finance Clerk and Personnel, which I did." No one asked him to submit other forms, and accused told the Finance Clerk to terminate the usual deduction from his pay. He was under the impression this would also end payment of the quarters allowance.

On June 1, 1961, Mrs. Tucker received the usual check and accused saw it. He informed "Finance . . . that I had been overpaid since 9 May to 31 May." A deduction was made from his pay to correct this matter. Thereafter, until his wife was hospitalized in November 1961, accused "never saw a check" and "thought they were stopped." His wife had her own checking account, and none of the first checks were deposited or negotiated by him.

Upon his wife's hospitalization, accused found out for the first time that she had continued to receive the checks. In view of his straitened circumstances and her condition, he decided to retain the checks and use the proceeds. He figured the money was "interest-free" and intended to repay it out of an anticipated reenlistment bonus and by deductions from his pay when the Government discovered its error. He had, in the past, been erroneously overpaid and allowed to satisfy the indebtedness by monthly deductions.

II

The initial issue upon which the Court granted review is as follows:

"1. Where the accused denied

378

knowledge (R. 58, et seq) of the receipt of the first five checks by his wife (Specifications 1–5; Specification 1, N. G.), did the law officer err in telling the court-martial that ignorance of the receipt of those checks was a defense so that the court-martial must acquit the accused unless convinced beyond a reasonable doubt 'the accused was not ignorant' of the receipt of such checks (R. 93, 96)?"

The law officer instructed the court members upon the elements of larceny and the lesser included offense of wrongful appropriation. He added advice concerning the effect of accused's guilty pleas to the latter offense under specifications 6 through 16 and delivered a general instruction on the law of principals. He also gave the court the following direction concerning mistake of fact:

"The court is further advised that the defense has introduced evidence in this case tending to show that, at the time of certain of the—excuse me, will you strike all of that: The court is further advised that the defense has introduced evidence—replacing therewith, the instruction: Ignorance or Mistake of Fact—General.

"If a certain fact, although an element of the offense, is one as to which knowledge is not required to prove the offense, ignorance or mistake of such fact, even if both honest and reasonable, will not be considered to be an excuse.

"When ignorance or mistake is material to guilt or innocence, the following instructions may be used as a guide:

"The defense has introduced evidence to show that, at the time of the alleged offense, the accused was ignorant of the fact that his wife was receiving certain of the allotment checks. With respect to this evidence, the court is advised that if the accused was laboring under such ignorance or mistake—in this case I believe ignorance, and if his ignorance was honest or honest and reasonable, or honest and not the

result of gross indifference, he cannot be found guilty either of the wrongful taking in this case or the larceny.

"The burden is on the prosecution to establish the accused's guilt by legal and competent evidence beyond a reasonable doubt. *Consequently, unless you are satisfied beyond a reasonable doubt that the accused was not ignorant of the fact that his wife received certain of the allotment checks, you must acquit the accused of those particular charges.*" [Emphasis supplied.]

Following a bench conference between the law officer and counsel, the former announced he had "made one error in my reading of the instruction on Ignorance of [sic] Mistake of Fact." He declared that he would "read the paragraph which contained the error and state what the error was and give the correct instruction." Thereafter, he informed the members:

"When ignorance or mistake is material to guilt or innocence, the following instructions may be used as a guide:

"The defense has introduced evidence to show that, at the time of the alleged offense, the accused was ignorant of the fact that certain checks were coming to the family in the first five specifications of the charge. With respect to this evidence, the court is advised that if the accused was laboring under such ignorance and if his ignorance was honest and not the result of gross indifference, he cannot be found guilty. I would like to strike the words 'and not the result of gross indifference,' and the last sentence will then read: With respect to this evidence, the court is advised that if the accused was laboring under ignorance or mistake and if his ignorance or mistake was honest, he cannot be found guilty of the offense charged.

"Any further corrections?

"TC: Sir, if I may request, will you give the last paragraph of that instruction too. Perhaps, you gave it before.

**379**

"LO: All right.

"The burden is on the prosecution to establish the accused's guilt by legal and competent evidence beyond a reasonable doubt. *Consequently, unless you are satisfied beyond a reasonable doubt that the accused was not honestly ignorant of the fact that his wife was receiving certain of the checks, you must acquit the accused.*" [Emphasis supplied.]

We pass the fact that the quoted instructions are completely untailored to the evidence and amount to no more than the reading of a form advice to the court-martial quite without regard either to the offenses involved or the state of the proof. Indeed, we note that the law officer even included introductory material from his source book which indicated that the language which he used was only a guide in framing a statement of the legal principle involved. Although we cannot believe such a confused attempt to advise the members could ever offer any real assistance to them in their deliberations, we here detect a far graver misapprehension of the law.

As is apparent, the law officer was attempting to characterize accused's defense to specifications 1 through 5 as ignorance of fact, but that is not what was in contention. Ignorance or mistake of fact affects the question of accused's intent or knowledge where such is an element of the offense charged. When a particular mental state is required to be established, the accused may controvert its presence by offering evidence that, at the time he committed the act alleged, he was either mistaken as to, or ignorant of, facts essential to the existence of the necessary *mens rea*. See, generally, United States v Lampkins, 4 USCMA 31, 15 CMR 31; United States v Rowan, 4 USCMA 430, 16 CMR 4; and Manson, "Mistake as a Defense," Military Law Review, October 1959 (Department of the Army Pamphlet 27–100–6), page 63. As was succinctly noted in *Rowan*, supra, at page 433:

". . . When one honestly believes he is taking property rightly, the criminal intent necessary to establish larceny is absent."

In the record before us, however, the accused did not deny the existence of an intent to steal because of an honest ignorance concerning the operative facts. His evidence went far beyond that. He contended he knew nothing of his wife's receipt of the checks involved in specifications 1 through 5; had nothing to do with their negotiation; and, in fact, until she was hospitalized, believed the allowance had been discontinued. In short, he denied any participation in the acceptance of the instruments or their conversion. Rather than simply pleading ignorance or mistake, he completely disassociated himself from any participation in the offenses alleged. The law officer, therefore, erred in his analysis of the evidence and in giving instructions to the court concerning the doctrine of ignorance of fact.

That the matter was not in issue does not, under the circumstances here presented, render the error harmless. As we recently noted, instructions regarding principles not involved in the case may have the effect of misleading the fact finders and be prejudicial to the accused. United States v Duckworth, 13 USCMA 515, 33 CMR 47. And, as in United States v Roberson, 12 USCMA 719, 31 CMR 305, we find such to be the case here.

In *Roberson*, supra, the accused was charged with larceny, the Government's case being based upon the inferences to be drawn from his possession of recently stolen property. The accused, on the other hand, declared he had received the property from a friend, believing him to have a legal right to it. The court-martial was advised of the inferences it might draw from the proof of possession and, based on accused's testimony, on the effect of mistake of fact. We reversed and pointed out that mistake was not in issue. In doing so, we said, at page 722:

"That [mistake was not in issue] does not, however, mean that the er-

roneous instruction was not prejudicial. The president charged the court properly concerning the inferences to be drawn from the possession of recently stolen property. United States v Hairston, supra. When the advice concerning honest and reasonable belief was added, the accused's explanation of his possession of the allegedly stolen property was improperly circumscribed by permitting the court members to weigh it in light of whether he knew or should have known that 'Graves' had stolen it. As noted above, this is a totally irrelevant circumstance for, granting the existence of guilty knowledge, a permissive taking from 'Graves' would not, regardless of accused's intent, constitute anything more than receiving stolen goods, in violation of Code, supra, Article 134, 10 USC § 934, an offense not charged and not included within the crime of larceny. United States v McFarland, supra. In short, in view of his testimony, the accused was entitled to an instruction that he must be acquitted if the members had a reasonable doubt that he took the property from its respective owners, even if they were convinced that he had taken it from 'Graves.' "

So also do we find prejudice from the law officer's instructions on mistake in this record. By emphasizing and attributing significance to accused's knowledge whether his wife had received the checks involved in specifications 1 through 5, he permitted the court to equate such knowledge to guilt of the offenses charged when it, in and of itself, was no more than a circumstance bearing on Tucker's criminal liability. Indeed, the antithesis of his confused advice was that conviction was possible if accused knew the checks were continuing to arrive. Rather, the court properly should have been informed it was accused's contention that he had not been involved in the receipt or conversion of these instruments and that, unless such participation was found to exist, he could not be convicted. In short, the charge to which Tucker was entitled was one which precisely and specifically, rather than merely generally or abstractly, pointed to his theory of defense. Perez v United States, 297 F2d 12 (CA 5th Cir) (1961); United States v Smith, 13 USCMA 471, 33 CMR 3.

In light of the fair risk that the court members were misled by the erroneous instructions concerning the effect of the accused's lack of knowledge, the findings of guilty of specifications 2 through 5 must be set aside. Specification 1 is not involved here, of course, as accused was acquitted under this count.

### III

The second issue upon which we granted review involves the following:

"2. Where the accused admitted knowingly cashing the checks represented by Specifications 6–16 but claiming an intent to repay the same at all times (R. 58, et seq.), did the law officer err in not affirmatively instructing on this as a defense to the larceny charged by those specifications?"

As set out above, the accused admitted judicially and by his pleas that he wrongfully retained the allowance checks involved in specifications 6 through 16 and converted them to his own use as an "interest-free" loan, intending at all times to repay the amount involved to the Government from an anticipated reenlistment bonus and through deductions from his pay. In connection with these charges, the law officer advised the court-martial of the elements of larceny and the lesser included offense of wrongful appropriation. In speaking of the latter, he pointed out:

"The accused has pleaded guilty to the lesser included offense of wrongful appropriation under all of the larcencies [sic] alleged; . . . *and the accused has introduced evidence attempting to show only an intent to temporarily deprive, defraud, or appropriate to his own use the property of the Government.*" [Emphasis supplied.]

After delineating the elements of the lesser offense, the law officer went on to declare:

"The accused's plea of guilty to the lesser included offense of wrongful appropriation constitutes a judicial confession of some of the elements of the offenses charged in Specifications 6 through 16 before you and of the Charge and hence these elements are established by the accused's plea without the necessity of further proof. However, his plea of guilty to the lesser included offense of wrongful appropriation *is not in itself a sufficient basis for a conviction of the offense of larceny as charged since there still remains in issue the element of taking, obtaining, or withholding by the accused with the intent permanently to deprive or defraud another person of the use and benefit of property or permanently to appropriate the same to his own use or the use of any person other than the true owner. With respect to the element of intent to permanently deprive or defraud, the court is instructed that no inference of larceny arises from any admission involved in accused's plea, and to warrant a conviction of larceny, the offense charged, the evidence must establish the element of permanent deprivation or defrauding beyond a reasonable doubt.*" [Emphasis supplied.]

The accused contends that these instructions were insufficient to advise the court members of the ▆▆▆▆ ▆ fact that accused, in his testimony, claimed only an intent temporarily to deprive the Government of the checks and their proceeds. We disagree. While the advice to the court is no model to be followed, it specifically delineated the difference between the offense charged and the lesser included offense of wrongful appropriation; drew attention to the fact that the accused "has introduced evidence attempting to show only an intent to temporarily deprive"; pointed out correctly that his pleas of guilty to wrongful appropriation left in issue the question of his intent; and that the evidence "must establish the element of permanent deprivation or defrauding beyond a reasonable doubt." Under the circumstances, therefore, we are certain that the instructions

were minimally sufficient to advise the court of the accused's theory of defense and to place his testimony in proper perspective. Cf. United States v Dinsmore, 11 USCMA 28, 28 CMR 252; United States v Robertson, 11 USCMA 36, 28 CMR 260; United States v Owens, 11 USCMA 88, 28 CMR 312.

In United States v Hayes, 8 USCMA 627, 25 CMR 131, we were faced with a similar argument. There, the accused arranged for an unauthorized advance pay on behalf of one Grier, which was to be repaid through deductions from the latter's pay. The law officer instructed the court-martial only on the elements of larceny, and a finding of guilty of wrongful appropriation was returned. We held the latter offense to be in issue on the basis that, as here, an intent to repay the Government was shown and reversed because of the legal insufficiency of the instructions on the need to find a criminal intent and because of the lack of advice on the offense found.

Here, however, a total lack of *mens rea* is not in issue, for accused conceded he wrongfully retained and used the checks and claimed only that he intended to repay the money. As noted above, the law officer, unlike the situation in *Hayes*, supra, submitted his contention to the court members and specifically advised it of the issue involved. More than this cannot be demanded, and we reject the argument that the advice was prejudicially insufficient in this area.

## IV

The last question before us deals with a petition in which a majority of the court members recommended clemency be granted the accused in the form of disapproval or suspension of the bad-conduct discharge, drastic reduction of the term of confinement at hard labor and his return to duty as soon as possible. It also appears that the petition was submitted subsequent to the trial, "without any intention of intimating that the original sentence was invalid or erroneous in any way" and because "many matters which would not be

given full consideration originally may now be taken into account."

Appellate counsel contend before us that the petition impeaches the adjudged sentence, for the ▮ same result might have been achieved had the same members voted for a lesser punishment. The matter, however, has been settled adversely to their claim by our decision in United States v Huber, 12 USCMA 208, 30 CMR 208, wherein we pointed out that post-trial clemency petitions—as opposed to statements forming a part of the announcement of the adjudged punishment—may not be used to impeach the imposed penalty. Such is no more than an invocation of the settled rule that jurors may not impeach their verdicts by post-trial declarations.

Ramsey v United States, 27 F2d 502 (CA 6th Cir) (1928); Bartholomew v Universe Tankships, Inc., 263 F2d 437 (CA2d Cir) (1959). For this reason, we must conclude that the petition, inconsistent as it is, has no legal effect with respect to the previously announced sentence.

The findings of guilty of specifications 2 through 5 and the sentence are set aside. The decision of the board of review is reversed and the record of trial is returned to The Judge Advocate General of the Air Force. The board may order a rehearing on the noted specifications and the penalty, or it may reassess the sentence on the basis of the remaining findings of guilty.

Chief Judge QUINN and Judge KILDAY concur.