UNITED STATES, Appellee

v

WILLIE JOE KING, Private, U. S. Army, Appellant

17 USCMA 17, 37 CMR 281

No. 19,789

May 5, 1967

 

*Captain Frank J. Martin, Jr.,* argued the cause for Appellant, Accused. With him on the brief was *Lieutenant Colonel Martin S. Drucker.*

*Captain Joel P. Schiff* argued the cause for Appellee, United States. With him on the brief were *Colonel Peter S. Wondolowski, Lieutenant Colonel David Rarick,* and *Lieutenant Colonel Francis M. Cooper.*

## Opinion of the Court

QUINN, Chief Judge:

The accused was arraigned before a general court-martial at Fort Gordon, Georgia, on a charge alleging premeditated murder of Private Joseph J. Poye, larceny of Poye's automobile and more than $900.00 in cash, and twenty-seven specifications of forgery based on use of an oil company credit card, in violation of Articles 118, 121, and 123, Uniform Code of Military Justice, 10 USC §§ 918, 921, and 923, respectively. He pleaded not guilty to the murder charge and guilty to all the other charges, but was found guilty as charged, and sentenced to be put to death. The convening authority approved the findings of guilty and the sentence. However, considering the accused's personal problems and to cure a "possible error" in the law officer's instructions as to the sentence, the board of review mitigated the death penalty to confinement at hard labor for life. We granted further review to consider certain aspects of the instructions as to the merits.

Evidence presented by the Government established beyond all doubt that the accused killed Poye, deliberately and with premeditation, in order to take his car and money. Among other things, the prosecution established that the ac-

cused purchased a gun from a pawnshop in Augusta, Georgia, several days before Poye was killed. At the same time he wrote to a girl in Mobile, Alabama, that he intended to buy a car; the car he described as the one he " 'liked' " was Poye's. He told a friend about the girl, and indicated he intended to make "a big impression" upon her, using $1,000.00 he expected to receive from his wife. On April 7, 1962, the accused obtained a six-day leave. He indicated that during his absence he would be in Mobile, Alabama. On April 8, he appeared in that city with Poye's car. He also had Poye's college ring. Using Poye's name, he sent a telegram to Ruston State Bank and Trust Company, Ruston, Louisiana, asking that all but $65.00 in Poye's account be wired to him in Mobile.[1] The bank transferred some $900.00 by Western Union, and the accused obtained the money from the Western Union office in Mobile by using Poye's identification card, upon which he had superimposed a picture of himself.

Poye was last seen between 8:00 and 9:00 p.m., on April 7, 1962. He was then with the accused in the barracks. On September 9, 1962, near Jewell, Georgia, Criminal Investigations Detachment agents found the skeletal re-

---

[1] Other evidence established that Poye, a few days before he was killed, had told the accused he had written a check for $65.00 for repairs to his car.

mains of a human being. A periodontist compared the teeth of the skeleton with dental charts of Poye's teeth, and concluded they were the same. Three pathologists also examined the skeleton. Their testimony established that Poye had been shot twice, once in the head and once in the back. One of the pathologists was of the opinion that Poye was first shot in the back. He based this opinion on the fact that the brain, which was still intact, did not contain an accumulation of blood. Other testimony indicated both shots were fired about the same time from a range of one to two feet. The head wound was "fatal"; and the back wound was "incompatible with life" in the absence of medical treatment.

At trial, the accused admitted he killed Poye.[2] He maintained he did not do so intentionally. He testified he and Poye were "the best of friends." Poye agreed to drive him to the bus station for his trip to Mobile. Since the bus was scheduled to leave after midnight, they visited a few bars to pass the time. Then, they returned to Fort Gordon to try to collect $4.70 owing to the accused. They could not find the debtor so they sat in Poye's car in the parking lot. They talked and listened to the radio. Poye was in the driver's seat of the car, a 1959 Buick convertible, and the accused was on the passenger's side. A cat suddenly appeared on the parking lot, and seemed to be "trying to get on one side of the [utility] pole to get out of the rain." Poye expressed the wish that he had a gun so he could shoot the cat. The accused told Poye he had a gun. He turned around and reached into his "AWOL bag," which was on the floor of the car behind the front seats. With his left hand, he took a clip of ammunition from one side of the bag; with his right hand, he picked up the pistol. He inserted the clip and "caught the receiver," pulling it "back to inject the first round." He did not "know exactly what happened," but "the gun fired." At first he thought he "had shot the car," but when Poye fell "over on the steering wheel" he saw "he was shot." His next thought was to get help. Since the hospital was "directly on the other end of the same street," he moved Poye to the passenger's side of the car and took over the driver's seat. He started for the hospital, but changed his mind and direction. He thought of his "past criminal record"; and that he had a gun on the post and had been drinking. He "became confused." He knew an investigation would be made, and thought that "when they started checking up on" him "they" would not believe "that it was an accident." He left Fort Gordon. He put Poye's body in the trunk of the car and drove around the countryside for a while. Then he stopped on a bridge on a country road. He removed Poye's body and threw it into a stream. He could not explain the second bullet wound in Poye's body.

Lieutenant Colonel Thomas P. Mullaney, a psychiatrist, testified as a defense witness. He stated he had examined the accused on April 23, 1964, and again on June 20, 1964.[3] He described the accused as an "antisocial character, with a schizoid type personality who may or may not have an underlying thinking disorder." In his opinion, the accused's mental condition was such that if he had "accidentally" shot someone "under circumstances where he might be accused of an unlaw-

---

[2] The accused had been arrested on April 20, 1962, in Oklahoma for bank robbery. He was indicted, convicted, and sentenced to twelve years imprisonment. However, in February 1964, he was released by the Oklahoma authorities to the military to face the charges in this case.

[3] The allied papers indicate the accused received a psychiatric evaluation at Eastern State Hospital, Vinita, Oklahoma. He was reported to have a "sociopathic personality," but able to know right from wrong and to assist in his defense; under Oklahoma law he was "considered to be mentally competent." At military defense counsel's request, a further psychiatric evaluation was made of the accused by military doctors. In May 1964, a board of medical officers at Walter Reed General Hospital determined the accused possessed an "[a]social personality," but was so far free from mental disease or defect as to be able to distinguish right from wrong; to adhere to the right; to understand the proceedings against him; and to cooperate intelligently in his defense.

ful killing," he would be "likely to flee"; and before fleeing the scene, the accused could "even go so far as to shoot another bullet hole into" the body. However, Dr. Mullaney acknowledged the accused "could tell right from wrong very well" when he last saw him on June 20, and he "thought he could determine right from wrong" when he was first examined on April 23. The doctor further testified the accused could tell right from wrong "in April of 1962." However, he maintained the accused did not have "any capability of long-range type planning that would lead to successful accomplishment of his particular goal." He admitted his opinion was formulated in terms of his "own definition of long-range," which he did not give; and he also admitted he did not know whether the accused's inability to make long-range plans would pertain "to murder itself." On that point, the following question and answer, in cross-examination by trial counsel, are important:

"Q Now, Colonel Mullaney, if you were advised that 'Premeditated murder is murder committed after the formation of a specific intent to kill someone and consideration of the act intended. A murder is not premeditated unless the thought of taking life was consciously conceived and the act or omission by which it was taken was intended. It is not necessary that the intention to kill shall have been entertained for any particular or considerable length of time.'[4] Could the accused premeditate according to that definition?

"A Yes, sir."

Dr. Mullaney testified on the morning of the last day of trial. The preceding afternoon, at the end of the accused's testimony, the law officer conferred with counsel in regard to proposed instructions. Defense counsel indicated he anticipated that the doctor's testimony would "not raise the issue of insanity," but would disclose a character disorder sufficient to affect the accused's ability to premeditate. On that basis, the law officer outlined appropriate instructions as to the effect of character or behavior disorder on the ability to premeditate. However, after both parties had finally rested their respective cases, the law officer indicated his belief that Dr. Mullaney's testimony had "negated" the need for "instructions on character disorder." Trial counsel agreed with this view of the evidence, but defense counsel continued to press for the instruction. The law officer yielded to defense counsel, but presented certain additions to the tentative instructions. Defense counsel indicated he had no objections to the changes. The revised instructions were given to the court members. Again, defense counsel indicated he had no objection to them; and he requested no additional instructions. It is now contended that part of these instructions is prejudicially erroneous. The challenged part is as follows:

"You are further advised that just as you may initially infer that a man is sane at the time of the alleged offense, you may likewise infer that he is capable of premeditation, and each member of the court is therefore authorized to infer that the accused was capable of premeditation until from the evidence a reasonable doubt as to his ability to premeditate at the time in question appears in the mind of such member."

Although defense counsel at trial and appellate defense counsel in this Court contend that Dr. Mullaney's testimony raised an issue as to the accused's mental capability to premeditate, that conclusion is not supported by the record. True, the law officer acceded to the defense position and gave the instruction now complained of, but the giving of an instruction "does not supply the evidence to raise an issue." United States v Dunnahoe, 6 USCMA 745, 758, 21 CMR 67. The accused testified he

---

[4] The quotation is apparently from the discussion of premeditation in paragraph 197d, Manual for Courts-Martial, United States, 1951. The substance of the discussion was cited with approval in United States v Gravitt, 5 USCMA 249, 258, 17 CMR 249; see also United States v Baguex, 2 USCMA 306, 309, 8 CMR 106.

20

killed Poye by an accidental discharge of his gun. The glaring flaw in his version of the shooting was the presence of a second bullet hole in Poye's body. Dr. Mullaney's testimony was obviously intended to present a possible explanation for the second wound. Although the doctor referred to an inability on the accused's part to make long-range plans, he did not define his concept of the ability to engage in "long-range type planning"; he indicated he did not know whether the accused had "an underlying thinking disorder"; and he conceded the accused could premeditate within the accepted meaning of that term. As we read Dr. Mullaney's testimony, it raised no issue as to the accused's ability to premeditate. Accordingly, we need not decide whether, in the abstract, the challenged instruction was wrong or misleading; if it was wrong, the accused was not prejudiced by it. United States v Richards, 10 USCMA 475, 28 CMR 41; cf. United States v Tucker, 14 USCMA 376, 380, 34 CMR 156.

In his second assignment of error, the accused contends the law officer erred in his discussion of the evidence the court-martial could consider. The contention has two aspects. The first is a general claim that the law officer was unfair to the accused in that he summarized the evidence supporting the prosecution's allegation of premeditation, but did not mention the evidence of negligence which tended to support the defense contention that Poye was shot by reason of the accused's careless handling of the gun. The second aspect of the assignment of error is that the instructions on the elements of the lesser offenses were not truly meaningful because the law officer did not mention any of the relevant evidence, and, therefore, did not present the "two mutually exclusive versions of the facts." See United States v Lyon, 15 USCMA 307, 35 CMR 279. Appellate defense counsel argue this imbalance in the instructional references to the evidence gave "short shrift" to the accused's testimony, while according "unfair" weight to the prosecution's case.

Instructions must fully and fairly present the factual issues to be determined by the court members. United States v Amie, 7 USCMA 514, 22 CMR 304. To achieve that purpose, the instructions may have to call attention to particular items of evidence so that the court members can know and understand the relationship these have to the specified rules of law. United States v Acfalle, 12 USCMA 465, 469–470, 31 CMR 51. How extensive the factual summary should be rests largely within the discretion of the law officer. United States v Nickoson, 15 USCMA 340, 35 CMR 312. Every summary of the evidence, however, must be fair, neither favoring one side nor discrediting the other. United States v Bellamy, 15 USCMA 617, 620, 36 CMR 115; United States v Nickoson, supra, page 344.

Exclusive of instructions on the voting procedure, the instructions in this case cover nine pages of the record. No useful purpose would be served by reproducing them here. We have carefully examined all the interstitial references to the evidence, and we are satisfied they were not unfairly weighted in favor of the Government or disparaging of the defense. True, the law officer enumerated more items of evidence favorable to the Government than to the defense theory. It is obvious, however, that the difference was not due to preferential selection of items of evidence by the law officer, but to the paucity of evidence favorable to the accused. We are also satisfied that the instructions on the lesser offenses were presented in meaningful terms. The accused admitted he shot Poye. His explanation was that the gun discharged unintentionally, as he attempted to load it. According to his testimony, therefore, the shooting was "accidental." The law officer directed the court members' attention to the word " 'accident,' " which he pointed out they had heard "mentioned many times in the course of the evidence in this case." He defined the meaning of the word. He also gave extensive instructions on the lesser offenses of culpable and simple negligence. Taking into consideration all

21

the instructions, we have no doubt that the court members fully understood the essential evidence relating to the lesser offenses. See United States v Nickoson, supra, at page 344.

The decision of the board of review is affirmed.

Judges FERGUSON and KILDAY concur.