## UNITED STATES

v.

**Airman Jeffrey L. KEEVE, FR 569–88–7103 Headquarters, 376th Strategic Wing Fifth Air Force (PACAF).**

**ACM S24373.**

U. S. Air Force Court of Military Review.

Sentence Adjudged 9 Dec. 1975.

Decided 22 Sept. 1976.

---

**2.** Such credit should be affirmatively indicated in the convening authority's action.

Appellate Counsel for the Accused: Colonel Jerry E. Conner and Captain Kenneth L. Davidson. Appellate Counsel for the United States: Colonel Julius C. Ullerich, Jr.

Before BUEHLER, HERMAN and ORSER, Appellate Military Judges.

## DECISION

ORSER, Judge:

Tried by a special court-martial with members, the accused stands convicted, despite his not guilty plea, of a single specification of indecent assault, in violation of Article 134, Uniform Code of Military Justice, 10 U.S.C. § 934. The approved sentence is a bad conduct discharge and confinement at hard labor for six months.

On appeal, appellate defense counsel have assigned several errors and invite our attention to errors submitted by the accused in his request for appellate representation. In our judgment, only two of the errors asserted warrant our attention. All others are either without merit or were fully discussed by the staff judge advocate in his review and properly resolved adversely to the accused.

In the initial error we address, counsel contend the military judge erred in admitting the accused's pretrial statement into evidence. In support of this contention appellate defense counsel argue, as the defense counsel unsuccessfully did at trial, that there were insufficient grounds for the accused's apprehension. On that basis, say counsel, the inculpatory statement the accused made while in unlawful detention fol-

lowing his apprehension, although preceded by *Miranda/Tempia* [1] warnings, was inadmissible.

■■■ As counsel correctly assert, in a situation involving a baseless arrest or apprehension, the Government has a heavy burden to show that an ensuing confession or admission was "an act of the accused's free will to purge the primary taint of the unlawful invasion." *Wong Sun v. United States,* 371 U.S. 471, 83 S.Ct. 407, 9 L.Ed.2d 441 (1963). Though counsel are accurate in their assertion that *Miranda/Tempia* warnings of themselves will not suffice to purge the primary taint of an unlawful invasion of Fourth Amendment rights in the form of an illegal arrest and detention, *Brown v. Illinois,* 422 U.S. 590, 95 S.Ct. 2254, 45 L.Ed.2d 416 (1975), we nevertheless find such rule inapplicable in these circumstances, for we are convinced the accused was lawfully apprehended and the resultant statement admissible.

In the military, an apprehension may lawfully be made "upon reasonable belief that an offense has been committed and that the person apprehended committed it." Article 7(b), Code, supra; *United States v. Herberg,* 15 U.S.C.M.A. 247, 35 C.M.R. 219 (1965). Here, the accused was apprehended by an agent of the Air Force Office of Special Investigations (OSI), who was unquestionably authorized to do so. Id; Manual for Courts-Martial, 1969 (Rev.), paragraph 19a. We need only examine the circumstances surrounding the apprehension for the existence of a "reasonable belief," that is, whether the accused was apprehended on the basis of probable cause to believe a crime had been committed and the accused committed it. *United States v. Stackhouse,* 23 U.S.C.M.A. 118, 48 C.M.R. 679 (1974); *United States v. Llano,* 23 U.S.C.M.A. 129, 48 C.M.R. 690 (1974); *United States v. Herberg,* supra.

The accused's apprehension followed a complaint of rape made by a Miss Pamela S, a 17 year old high school student. The alleged victim, who appeared upset and had small abrasions on her knees, related to agents of the OSI that after attending a football game earlier in the evening, she had been forced into an automobile by two black male individuals, taken to a wooded area about a mile from the stadium, and raped. Though she was unable to identify or fully describe her assailants, she did remember that one of them was referred to as "Tony," and they were both tall, thin and had short hair. She also recalled their car was black.

Upon subsequent medical examination, a preliminary report of specimens taken from Miss S showed negative for the presence of sperm. The doctor indicated, however, that her vagina had been penetrated by some object. He could not determine whether the penetration had been made by a penis.

The OSI agents continued their investigation by interviewing Pamela's sister who had also attended the football game. She knew nothing of the circumstances but did identify other teenagers she had seen in the area. Those individuals were duly questioned and the agents learned that Pamela had been seen in the company of three black males after the football game and had left with them. Though no one had seen Miss S enter an automobile with the three, she was observed to be walking in the direction of a parked vehicle.

One of those interviewed, a witness named Wright, told the agents that though he had seen Pamela talking with three individuals, he could not identify any of them. The agents subsequently had reason to believe Wright was untruthful in his asserted inability to recognize the possible assailants. For one thing, during their session with him they gained the impression he was withholding information. More concretely, three or four other witnesses informed them they had seen Wright conversing with the three black males while they were with Pamela. Wright was reinterviewed, and when confronted with the information furnished by the others, admitted his earlier

1. *Miranda v. Arizona,* 384 U.S. 436, 86 S.Ct. 1602, 16 L.Ed.2d 694 (1966); *United States v.* *Tempia,* 16 U.S.C.M.A. 629, 37 C.M.R. 249 (1967).

statement was untrue, that he did know the individuals in question, and had indeed conversed with them as reported. He identified the three as the accused, and individuals named Suber and Leggett. According to one of the agents, Wright further related he had approached the group and asked Leggett what was going on. Leggett is said to have replied something to the effect that the accused "thinks he's going to get some." On the witness stand during trial, one of the agents admitted that since he had talked with several witnesses he was not certain that Wright was the one who had mentioned Leggett's comment.

Armed with all this information, and after ascertaining from the accused's first sergeant that the accused, Leggett, and Suber were known to be associates, the investigators decided they had probable cause to apprehend the accused and his companions for suspected rape and to interrogate them. After coordinating the matter with the local office of the staff judge advocate, the OSI agents apprehended the accused at his duty section the morning after the incident, handcuffed him, and transported him to their office. There, he was fully warned of his rights, voluntarily waived them, and submitted to questioning. During the interrogation, the accused authored the inculpatory statement which was subsequently admitted in evidence, over objection, during his trial for indecent assault.

The cornerstone of the defense position, that the recited circumstances furnished insufficient cause for the accused's arrest, is their charge that the Government failed to establish the reliability of witness Wright, whom they label as a Government informer. They point out that Wright's reliability was untested before the incident and, moreover, he was shown to have lied when initially asked about the individuals seen with Pamela.

Without dispute, the significant basis for the accused's apprehension was the information supplied by Wright. Absent his eyewitness identification, the authorities had no basis to connect the accused with the crime under investigation. But the defense plainly misses the mark in their contention that the information supplied by Wright must be tested by the principles and rules applicable in typical informant cases.

Informers, paid or unpaid, are commonly encountered in narcotics investigations. Such individuals, of course, are usually deeply involved in the very criminal activity the police are investigating. Ofttimes, they have long criminal records involving drug addiction, perversion, thievery and the like. The law has long recognized that information supplied by such individuals would not ordinarily be believed by a reasonable and prudent person, unless there be some independent basis for crediting it. See the dissenting opinion by the late Chief Judge Quinn in *United States v. Davenport,* 14 U.S.C.M.A. 152, 33 C.M.R. 364 (1963). Thus it was that in *Aguilar v. Texas,* 378 U.S. 108, 84 S.Ct. 1509, 12 L.Ed.2d 723 (1966), the United States Supreme Court enunciated the now well known two-prong test for the existence of probable cause to arrest where informers are involved. The first of the two is termed the basis of knowledge requirement, that is, the informer must supply sufficient underlying circumstances on which he predicated his conclusion the accused was involved as alleged. The other is the reliability of the informer requirement, that is, there must be sufficient underlying facts to support the arresting officer's conclusion that the informer is credible or his information reliable. Put another way, the informer must be demonstrably truthful or his information verified. *Draper v. United States,* 358 U.S. 307, 79 S.Ct. 329, 3 L.Ed.2d 327 (1959); *United States v. Stackhouse* and *United States v. Llano,* both supra; *United States v. Scarborough,* 23 U.S.C.M.A. 51, 48 C.M.R. 522 (1974); *United States v. Lidle,* 21 U.S.C.M.A. 455, 45 C.M.R. 229 (1972); *United States v. Morales,* 49 C.M.R. 458 (A.C.M.R.1974).

In the case at hand, as contrasted with those cited, we need not subject Wright to the technical rigors of the *Aguilar* test. Wright, as opposed to a narcotics informer whose credibility may be suspect, is entitled to be treated much like an ordinary public-

spirited citizen witness who, absent a contrary indication, is far less likely to provide false or untrustworthy information. See *Jaben v. United States,* 381 U.S. 214, 85 S.Ct. 1365, 14 L.Ed.2d 345 (1965); *United States v. Harris,* 403 U.S. 573, 599, 91 S.Ct. 2075, 29 L.Ed.2d 723 (1971), dissenting opinion by Justice Harlan; *United States v. Davenport,* supra.

With that distinction in mind, we are satisfied that witness Wright's identification of the accused as a participant in the offense was entitled to be fully credited and, together with the other known circumstances, provided the investigating officials the necessary justification for the apprehension. Here, the information regarding the accused's identity came directly from Wright's personal encounter with the accused and his companions, with all of whom he was acquainted. The first-hand nature of the information is of itself a weighty factor in support of probable cause. See *United States v. Bunch,* 19 U.S.C.M.A. 309, 41 C.M.R. 309 (1970). As indicated, the three suspects were seen with the alleged victim shortly before the crime occurred, and one of the witnesses, perhaps Wright, informed the investigators that one of the three had remarked that the accused planned a sexual encounter.

The fact that Wright initially chose to withhold information concerning the identity of the accused and his companions gives us no concern. In fact such circumstances, in light of others, serves to strengthen the reliability of Wright's subsequent identification. Significantly, Wright's identification of the suspects came in response to an investigator's accusation that he had earlier not been candid. When he was reinterviewed, of course, the investigator knew Wright had been seen with the accused and his party. In our judgment, the investigators had good cause to conclude that Wright's initially professed inability to recognize the three was borne of a desire to protect them from detection. His eventual identification of the suspects, combined with the agents' knowledge he had been observed mingling and conversing with them, provided the investigators with rea-

sonable assurance he was finally being truthful.

In consideration of these circumstances, we are satisfied the investigating agents were in possession of reasonably trustworthy information. See *United States v. Stackhouse,* supra. We accordingly hold that the sum total of information known to the agents provided probable cause to apprehend the accused, and his subsequent statement, given after being thoroughly advised of his rights, was properly admitted in evidence.

In the remaining assignment of error we address, appellate defense counsel contend the military judge erred prejudicially by instructing the court members that an honest and reasonable mistake on the part of the accused that the indecent assault victim was consenting to his sexual aggressions would require his acquittal of the offense. Counsel argue that the instruction was erroneous to the extent that it required the members to apply the objective quality of reasonableness in their evaluation of the accused's conduct. Appellate government counsel reply that mistake of fact regarding the consent of the victim is not a defense to indecent assault, and consequently no instruction of any kind was necessary. In the alternative, they contend that if mistake of fact concerning the victim's consent is a permissible affirmative defense, the instruction given by the trial judge was proper. Evaluation of this issue necessitates a more detailed elaboration of the pertinent circumstances alluded to in the initial assertion of error.

The victim Pamela testified that at the conclusion of a football game she initiated contact with the accused and his companion—in fact the other evidence showed the accused was with two companions. She had attended the game with her sister; however, Pamela's sister left before the game ended and Pamela did not know where she was. When the game was over, Pamela proceeded to the parking lot to look for her sister and to await the arrival of her father who was supposed to be there to take the

girls home. At that time she noticed the accused and his companion, both of whom appeared intoxicated.

Though Pamela did not know the individuals, she asked them for a ride to the Youth Center where she planned to telephone her father to come for her. The two agreed to accommodate her. On the way to their vehicle, Pamela, whose eyesight was bad, stumbled and fell and one of the men assisted her. Thereafter, with Pamela seated in the back seat of the vehicle, and the accused at the wheel, the group drove from the parking lot.

During the drive everyone conversed in a friendly manner and everything appeared normal, except that the accused did not proceed to the Youth Center. Instead, he stopped the vehicle in a secluded wooded area. Then, said Pamela, the other individual left the vehicle and walked away and only she and the driver (the accused) remained. The accused put her in the front seat and soon placed his hand on her knee. She told him to remove it. He then asked if she wanted her pants down. Though she told him no and resisted, the accused managed to lower her panties and eventually, despite her continued resistance, inserted his finger in her vagina. Pamela testified she was frightened, and crying, and told the accused to stop, but he did not comply. He finally desisted only after she started screaming. The other individual soon returned to the vehicle, and she was then driven to the Youth Center where she promptly reported what had occurred. Pamela admitted that in her initial complaint she said she was forced into the accused's vehicle. She had lied in that respect, she said, because she was afraid to tell her parents she had voluntarily entered the automobile.

The accused testified in his own behalf. His version of the preliminary events essentially coincided with Pamela's recitation. He related that he and his two companions had consumed a bottle of wine during the football game and he was feeling "pretty high" when Pamela approached and asked for a ride to the Youth Center. She initial-

ly impressed him as being intoxicated or "high on something." Though he gave her directions on how to get to the Center, it was evident to him she desired a ride. The accused eventually acceded to her request, and in due course he and his companions departed in his vehicle, with Pamela in the back seat. While driving, the accused found himself wondering why Pamela had approached his group when there were others present she could as easily have asked for a ride. In line with this thought process, he then decided to drive to a secluded area of the base instead of the Youth Center. Pamela was not heard to protest. During the ride, the occupants of the vehicle engaged in friendly conversation.

When they reached their destination, the accused's companions exited the vehicle and walked a short distance away. The accused then told Pamela to get in the front seat. She complied. With no words spoken, the accused placed his hand on her knee and then pressed her thigh. Pamela did not protest. He then adjusted the auto seat she occupied to a reclined position. Still, Pamela made no protest. Then, said the accused, he "grabbed" her panties and pulled them down. When Pamela asked what he was doing, the accused told her they were going to make love. He then "reached for her vagina," but she thwarted him by blocking the area with her hands and said "No . . . stop, you sex maniac." The accused testified he interpreted her conduct to mean she did not desire to have sexual relations so he respected her decision and immediately ceased his amorous efforts. He recalled that Pamela also told him he had scratched her.

The accused testified that his companions soon returned to the car, and they then proceeded directly to the Youth Center. During the ride he and Pamela engaged in casual conversation. Upon reaching the area of the Youth Center, he parked by the nearby library, assisted Pamela from the vehicle, and gave her directions to the Center as he was aware from their conversation that she had poor eyesight.

On cross-examination, the accused repudiated certain admissions contained in the statement he made to the OSI following the incident (earlier referenced in our discussion of the initial error). In the statement, the accused admitted that during his encounter with Pamela he rubbed her vaginal area with his hand, and though not intentionally done, he may have penetrated her vagina with his finger because he recalled her saying something about his fingernail scratching her. The statement reflects that after he succeeded in pulling her panties down, Pamela asked him what he was doing. He made no response, but began rubbing her genital area while at the same time massaging his unexposed penis with his other hand. The statement continues that though Pamela protested, he continued to "rub her private area and Pamela said, 'Stop it hurts.'" Then Pamela called him a sex maniac. At that point he desisted in his efforts because her comment bruised his ego. The statement further contains the accused's denial that he at any time exposed his penis or that he ever threatened her in any manner even though she told him she intended to report what had occurred to her parents or the police.

The accused asserted that everything in the statement at odds with his trial testimony was false. He attributed the inaccuracies in the statement primarily to the fact that he had been told he was suspected of the serious offense of rape. The accusation greatly upset him, for he knew he was the logical suspect, in spite of the fact that he was not guilty. He reasoned it was in his best interests to mix lies with the truth in hopes of demonstrating that he was not guilty of rape.

Upon careful consideration, in our opinion the accused's evidence related to the question of whether his charged conduct was consensual, or, for that matter, whether it even occurred as alleged, e. g., indecent assault by fondling the victim's vagina. *United States v. Jones,* 10 U.S.C.M.A. 122, 27 C.M.R. 196 (1959); *United States v. Burt,* 45 C.M.R. 557 (A.F.C.M.R.1972), pet. denied, 45 C.M.R. 928. Here, as in the cited cases, the accused claimed no specific mistake as

regards his own conduct. He, in essence, asserted that Pamela's initial behavior and her subsequent acquiescence in the face of his sexual advances added up to acceptance of and cooperation with his aggressive behavior. As stated by the Court of Military Appeals in *United States v. Jones,* supra, 27 C.M.R. at page 202, and fully applicable here:

> In short, the accused's testimony only raised a factual issue of consent which was presented to the court under full and proper instructions and was determined adversely to him.

Having so found, the military judge's instruction on the perceived defense of mistake of fact was a gratuity which, in these circumstances, could only have benefited the accused. See *United States v. Amie,* 7 U.S.C.M.A. 514, 22 C.M.R. 304 (1957); *United States v. Tucker,* 14 U.S.C.M.A. 376, 34 C.M.R. 156 (1964); *United States v. Roeder,* 17 U.S.C.M.A. 447, 38 C.M.R. 245 (1968).

■ Even assuming for the purpose of this discussion that mistake of fact as to consent is a valid defense, and was raised by the instant circumstances, the accused would still be entitled to no relief. In our judgment, the trial judge's instruction that such mistake must be both honest and reasonable to be exonerating (which, we note, was substantially as requested by trial defense counsel) stated the proper standard.

■ Appellate defense counsel, in support of their position that a mistake of fact as to consent need only be honestly held by the accused, cite decisions of the Court of Military Appeals holding that indecent assault is a specific intent offense. *United States v. Burden,* 2 U.S.C.M.A. 547, 10 C.M.R. 45 (1953); *United States v. Wycliff,* 3 U.S.C.M.A. 38, 11 C.M.R. 38 (1953). They correctly observe that where an offense involves a specific rather than a general criminal intent, the rule, almost without exception, is that a mistake by the accused as to a crucial factor he assumes to exist need only be honest, not honest and reasonable. *United States v. Holder,* 7 U.S.C.M.A. 213,

22 C.M.R. 3 (1956); *United States v. Sicley,* 6 U.S.C.M.A. 402, 20 C.M.R. 118 (1955); *United States v. Rowan,* 4 U.S.C.M.A. 430, 16 C.M.R. 4 (1954).

 The shortcoming in this reasoning, however, when applied to the instant charge is that the only specific intent involved in the offense of indecent assault is the accused's intent to gratify his lust or sexual desires. *United States v. Rozema,* 33 C.M.R. 694 (A.F.B.R. f. rev., 1963), pet. denied, 33 C.M.R. 436; Manual for Courts-Martial, supra, paragraph 213f(2). As succinctly pointed out by appellate government counsel, when an individual participates in a sexual act with another with the intent to gratify his lust, that intent is present regardless of whether the other participant consents or objects to the act. Consequently, whether or not the individual believes the other party is receptive to his aggressive sexual behavior is simply not material to his intent to assuage his desires.

It follows that a mistaken belief by the accused that his conduct is consented to would have relevance only to the assault aspect of the offense, as to which only a general criminal intent is involved. See *United States v. Mayville,* 15 U.S.C.M.A. 420, 35 C.M.R. 392 (1965); *United States v. Singletary,* 14 U.S.C.M.A. 146, 33 C.M.R. 358 (1963). Consequently, if mistake of fact is a valid defense to the offense of indecent assault,[2] an accused who asserts it is entitled to relief from criminal responsibility only if he demonstrates that his misconception was honest and, in the particular circumstances, reasonable.

For the reasons stated, the findings of guilty and the sentence are

AFFIRMED.

BUEHLER, Senior Judge, and HERMAN, Judge, concur.

2. We must concede there is some authority in the civilian courts that it is, as well as authority by analogy in military rape cases. See the discussion and cases cited in 6 Am.Jur.2d, *Assault and Battery,* Sections 60 and 67; *United States v. Burt,* supra; *United States v. Steele,* 43 C.M.R. 845 (A.C.M.R.1971).